709 A.2d 1264

Aileen L. NOBLE et al.

v.

Charles A. BRUCE, Jr.

Thomas W. FAUNTLEROY, Jr. et al.

v.

Sara N. BLIZZARD, Personal Representative et al.

Nos. 7, 55, Sept. Term, 1997.

Court of Appeals of Maryland.

May 21, 1998.

Stanard T. Klinefelter (Shale D. Stiller, Kurt J. Fischer, Marta D. Harting, Piper & Marbury, L.L.P., Baltimore; Wil-

liam G. Duvall, Jr., Duvall & Duvall, Salisbury, all on brief), for petitioner.

Shale D. Stiller (Brett Ingerman, Piper & Marbury, L.L.P., on brief), Baltimore, for appellants.

Alvin I. Frederick (James E. Dickerman, James M. Timmerman, Eccleston and Wolf, on brief), Baltimore, for respondents and appellees.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW and RAKER, JJ., and MARVIN H. SMITH and ROBERT L. KARWACKI, Judges (retired), Specially Assigned.

CHASANOW, Judge.

The two consolidated cases before this Court, *Noble, et al. v. Bruce*, No. 7, September Term 1997, and *Fauntleroy, et al. v. Blizzard, et al.*, No. 55, September Term 1997, present the identical issue of whether a nonclient, testamentary beneficiary may maintain a cause of action for professional malpractice against an attorney where it is alleged that the attorney either provided negligent estate planning advice to the testator, or negligently drafted the testator's will, in a manner which resulted in significant estate and inheritance taxes that could have been avoided.

I.

A.  Noble

The *Noble* beneficiaries are six of eight surviving children of Earl and Florence Long. The Longs retained Respondent, Charles A. Bruce, Jr., to advise them in planning their estates and preparing their wills. The Longs owned, as joint tenants with right of survivorship, approximately 366 acres of real property including several farms, securities worth $660,000, and cattle worth approximately $30,000. Bruce prepared "mirror wills" which were executed on July 29, 1991. Under these wills, Mr. Long bequeathed all of his interest in the Longs' property to Ms. Long if she survived him, and Ms.

Long bequeathed all of her interest in their property to Mr. Long if he survived her. Both of the wills also provided that upon the death of the survivor: 1) the family residence and curtilage on one of the farms would pass to Lorraine Kulyncyz, one of the Longs' daughters who is not a party in this case; 2) the Longs' partial interest in certain other real property passed to Mr. Long's sister; and 3) the remainder of the estate passed to the Longs' eight children as joint tenants with right of survivorship, subject to a life estate in Thomas F. Long, one of their sons who is not a party in this case.

On August 28, 1991, Mr. Long died, and all of his property passed to Ms. Long pursuant to the will and by operation of the joint tenancies, free from federal estate taxes under the marital deduction provided in 26 U.S.C. § 2056. Shortly after Mr. Long's death, Ms. Long transferred all of her real property to Lorraine Kulyncyz and Thomas F. Long.[1] On June 22, 1994, Ms. Long died.

On August 25, 1994, the beneficiaries filed a legal malpractice action against Bruce alleging that Bruce was negligent in failing to advise Mr. and Ms. Long that they could each shelter up to $600,000 in both of their estates from any federal estate tax under 26 U.S.C. § 2010, the Unified Credit Against Estate Tax. If both spouses use the Unified Credit, up to $1.2 million can pass to beneficiaries free of federal estate tax. In order for both spouses to take advantage of the Unified Credit, one mechanism commonly used is the bypass, or credit shelter, trust for the benefit of the surviving spouse. In his affidavit in support of summary judgment, Bruce asserted that he advised the Longs of the ramifications of federal estate and gift tax laws and the benefits of utilizing a bypass trust, but the Longs rejected such a mechanism because it would interfere with their control over their assets during their lifetimes.

---

1. This transfer was the subject of a separate lawsuit by the beneficiaries against Lorraine Kulyncyz and Thomas F. Long in the Circuit Court for Somerset County entitled Long, et al. v. Long, et al., Case No. 94-CA-04201, which has now been settled.

Prior to discovery, Bruce filed a motion to dismiss the complaint, or in the alternative, a motion for summary judgment. On July 26, 1995, the Circuit Court for Somerset County granted summary judgment in favor of Bruce determining that the beneficiaries would be unable to prove what the Longs' intentions were and unable to contradict Bruce's assertion in his affidavit that he "fully advised" the Longs regarding the ramifications of federal estate and gift taxes and the use of the bypass trust. The circuit court noted that the issue of "whether third party beneficiaries may maintain an action for damages against an attorney, with whom they have no privity, for alleged failure to draft a will properly so as to give effect to the testator's intended disposition of property" was "irrelevant."

On appeal, the Court of Special Appeals, in an unreported per curiam opinion, affirmed the judgment of the circuit court on other grounds holding that the *Noble* beneficiaries did not have standing to sue Bruce as third-party beneficiaries under *Kirgan v. Parks*, 60 Md.App. 1, 478 A.2d 713, *cert. denied*, 301 Md. 639, 484 A.2d 274 (1984). On March 14, 1997, this Court granted the *Noble* beneficiaries' petition for writ of certiorari.

## B. Fauntleroy

Because the issue before us arises from the granting of a motion to dismiss the complaint, we must assume as true all well-pleaded material facts in the complaint, the exhibits, and any reasonable inferences that may be drawn from them. *See Flaherty v. Weinberg*, 303 Md. 116, 135–36, 492 A.2d 618, 628 (1985). The complaint alleges that the *Fauntleroy* beneficiaries are the sole beneficiaries of a residuary clause contained in the will of the late Sue M. Jackson. Ms. Jackson retained T. Hughlett Henry, Jr.,[2] and his law firm, Henry & Price, to advise her in planning her estate and preparing her will. Ms. Jackson's will was executed on March 11, 1983. Ms. Jackson owned a significant amount of stock in a company called Pittsburgh Des Moines Steel Company (PDM). The 1983 will

---

2. Henry had been Ms. Jackson's attorney for many years.

bequeathed her shares of PDM stock to the children and grandchildren of William R. Jackson, Ms. Jackson's brother-in-law. The 1983 will also directed that all of the taxes be paid out of the residuary estate. On March 29, 1983, Henry sent to Ms. Jackson a letter estimating the federal estate taxes that would be imposed on her estate at her death. The letter included the following statement by Henry: "I do not know whether you were aware that the tax problem in your estate is as bad as it is and I am all the more pleased that we have made the decision to have the bulk of the PDM stock pay its own share of that tax."

Ms. Jackson later added two codicils to her 1983 will, but neither codicil changed the clause regarding payment of taxes. In 1988, Ms. Jackson revoked the 1983 will and executed a new will also prepared by Henry and his firm. However, the 1988 will was substantially the same as the 1983 will, leaving intact the clause directing all of the taxes to be paid out of the residuary estate. Ms. Jackson subsequently executed two codicils on March 29, 1990 and on January 28, 1992. Again, these codicils did not alter the clause regarding payment of taxes.

In April 1990, Ms. Jackson and PDM entered into a stock purchase agreement which provided that upon Ms. Jackson's death the estate would sell all of Ms. Jackson's PDM shares back to PDM at a price equal to the closing price of the stock as of the date of her death. Ms. Jackson's obligation under this agreement was conditioned on the transaction being treated as a sale or exchange, rather than a dividend, for tax purposes. The stock purchase agreement, however, was never implemented upon Ms. Jackson's death because this condition could not be satisfied. The agreement was ultimately declared null and void.

On January 10, 1994, Ms. Jackson died. In addition to a farm, Ms. Jackson's estate included 44,816 shares of PDM stock, worth approximately $1.4 million. Because the stock purchase agreement was not implemented, the PDM stock passed to certain beneficiaries as provided in Ms. Jackson's

1988 will and its codicils. The estate and inheritance taxes totaled approximately $910,000 and were borne by the *Fauntleroy* beneficiaries as residuary beneficiaries.

On January 8, 1997, the *Fauntleroy* beneficiaries filed a complaint against Respondents, Sara N. Blizzard and W. Thomas Fountain, Personal Representatives of the Estate of Henry[3] and his law firm, alleging that Henry and his firm committed malpractice by negligently preparing the 1983 will so that all taxes would be paid out of the residuary estate, contrary to Ms. Jackson's intent. Respondents subsequently filed a motion to dismiss or, in the alternative, a motion for summary judgment. Prior to discovery, a hearing was held on Respondents' motion, and the Circuit Court for Talbot County granted Respondents' motion to dismiss on April 4, 1997, ruling that the *Fauntleroy* beneficiaries lacked standing to sue Respondents under *Kirgan.*

On April 10, 1997, the Fauntleroy beneficiaries appealed to the Court of Special Appeals and also filed in this Court a petition for writ of certiorari. This Court issued a writ of certiorari on July 30, 1997 prior to proceedings in the Court of Special Appeals.

## II.

The issue before this Court has been the subject of many articles in recent years. *See, e.g.*, Martin D. Begleiter, *Attorney Malpractice in Estate Planning—You've Got to Know When to Hold Up, Know When to Fold Up*, 38 KAN. L. REV. 193 (1990); Helen Bishop Jenkins, *Privity—A Texas–Size Barrier to Third Parties for Negligent Will Drafting—An Assessment and Proposal*, 42 BAYLOR L.REV. 687 (1990); Gerald P. Johnston, *Legal Malpractice in Estate Planning— Perilous Times Ahead for the Practitioner*, 67 IOWA L. REV. 629 (1982). *See generally* Symposium, *The Lawyer's Duties and Liabilities to Third Parties*, 37 S. TEX. L. REV. 957 (1996). We last addressed the issue of whether an attorney may be

---

**3.** Henry died on August 28, 1994.

held liable to a nonclient for legal malpractice in *Flaherty*, supra. In *Flaherty*, we recognized that the state of the law regarding attorney liability to nonclients was "far from settled." 303 Md. at 125, 492 A.2d at 622. Our review of the present state of the law indicates that our previous statement still holds true. In attorney malpractice cases arising out of will drafting or estate planning, courts have continued to follow three different approaches: 1) the strict privity theory; 2) the balancing of factors theory; and 3) the third-party beneficiary theory.[4]

## A. The Strict Privity Rule

We begin with a discussion of the traditional rule of strict privity. Over one hundred years ago, the United States Supreme Court held that a third party not in privity with an attorney has no cause of action against the attorney for negligence in the absence of fraud or collusion. *Nat'l Savings Bank v. Ward*, 100 U.S. 195, 205–06, 25 L.Ed. 621, 625 (1879). In attorney malpractice cases, Maryland generally adheres to the strict privity rule first explicated by this Court in *Wlodarek v. Thrift*, 178 Md. 453, 13 A.2d 774 (1940). In *Wlodarek*, this Court noted that an attorney is not liable to a nonclient for the alleged failure to properly examine the title to certain realty. 178 Md. at 468, 13 A.2d at 781. We later followed the strict privity rule in *Kendall v. Rogers*, 181 Md. 606, 31 A.2d 312 (1943), holding that an attorney was not liable to non-

---

4. We note that the strict privity theory is generally applied in a tort action to bar a cause of action against an attorney by a third party not in privity, and the third-party beneficiary theory generally arises as a basis for a contract action. Other jurisdictions, however, have adopted the third-party beneficiary theory as an exception to the strict privity rule in tort actions and have permitted an intended beneficiary to maintain an attorney malpractice action in either tort or contract. *See, e.g., Stowe v. Smith*, 184 Conn. 194, 441 A.2d 81, 84 (1981); *Lorraine v. Grover, Ciment, Weinstein & Stauber, P.A.*, 467 So.2d 315, 317 (Fla. Dist. Ct. App. 1985). This court has previously noted that, although the third-party beneficiary theory is usually applicable to contract actions, "the scope of duty concept in negligence actions may be analogized to the third party beneficiary concept in the context of attorney malpractice cases." *Flaherty v. Weinberg*, 303 Md. 116, 130, 492 A.2d 618, 625 (1985).

clients in negligence for representations made to the non-clients regarding their obligation to cure a defective title to a farm that they had previously conveyed to the attorney's client. In *Kendall*, we set forth the elements of a cause of action for negligence or malpractice against an attorney. 181 Md. at 611–12, 31 A.2d at 315. Specifically, a plaintiff must allege: 1) the attorney's employment; 2) his neglect of a reasonable duty; and 3) loss to the client proximately caused by that neglect of duty. *Flaherty*, 303 Md. at 128, 492 A.2d at 624. Thus, we have recognized that a plaintiff in an attorney malpractice action must, as a threshold matter, "allege and prove the existence of a duty between the plaintiff and the defendant." *Flaherty*, 303 Md. at 134, 492 A.2d at 627.

In *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986), we discussed the concept of duty where the plaintiffs' injury was purely economic. *Jacques* involved a claim by home buyers against a bank alleging negligence, *inter alia,* in the processing and determination of the Jacques' application for a residential loan. 307 Md. at 528, 515 A.2d at 756. Upon concluding that a contract existed between the Jacques and the bank, we held that under the circumstances of the case the bank owed a duty of reasonable care to the Jacques in the processing and determination of their loan application. *Id.* We stated that:

"In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."

*Jacques*, 307 Md. at 534–35, 515 A.2d at 759–60. We further noted that an inverse correlation existed between the nature of the harm and the parties' relationship.

"As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty."

307 Md. at 537, 515 A.2d at 761. In a case involving a claim brought by a condominium association against the general contractor, developer, and architect of the building for the cost of correcting a construction defect, this Court determined that privity was "not an absolute prerequisite to the existence of a tort duty . . . extended to those persons foreseeably subjected to the risk of personal injury." *Council of Co–Owners v. Whiting–Turner*, 308 Md. 18, 32, 517 A.2d 336, 343 (1986). As a general rule, however, if the risk created by negligent conduct is merely one of economic loss, "no tort duty will be found absent a showing of privity or its equivalent." *Jacques*, 307 Md. at 537, 515 A.2d at 761.

Although there may be a trend to relax or abandon the strict privity rule, a number of jurisdictions still retain the rule that, in attorney malpractice cases, absent fraud, collusion, or malice, an attorney is not liable to a nonclient for harm caused by the attorney's negligence in the drafting of a will or planning an estate. *See, e.g., St. Mary's Church of Schuyler v. Tomek*, 212 Neb. 728, 325 N.W.2d 164, 165 (1982) (holding that attorney who drafted will owed no duty to alleged beneficiaries of the will's residuary clause, and thus, alleged beneficiaries could not maintain negligence action); *Viscardi v. Lerner*, 125 A.D.2d 662, 510 N.Y.S.2d 183, 185 (1986) (holding that alleged intended beneficiaries had no cause of action against testator's attorney for negligently drafting will so that alleged beneficiaries inherited nothing); *Simon v. Zipperstein*, 32 Ohio St.3d 74, 512 N.E.2d 636, 638 (1987) (holding that, absent fraud, collusion, or malice, the beneficiary of the will had no standing to bring malpractice action against the testator's

attorney for negligence in drafting the will that allegedly failed to properly set forth the testator's intent); *Dickey v. Jansen*, 731 S.W.2d 581, 582 (Tex.Ct.App.1987) (holding that beneficiaries of trust provision in will had no cause of action against testator's attorney for negligence in preparing will with invalid trust provision); *Copenhaver v. Rogers*, 238 Va. 361, 384 S.E.2d 593, 594–95 (1989) (holding that grandchildren of testator, who held a remainder interest in a trust, had no cause of action in negligence where they alleged, *inter alia*, that testator's attorney negligently drafted will which resulted in failure of trust provision and loss of the grandchildren's remainder interest and that the attorney provided negligent advice which resulted in significant estate and inheritance taxes).

Application of the strict privity requirement in the will drafting or estate planning context has been justified by courts primarily on the following public policy grounds. First, the rule protects the attorney's duty of loyalty to and effective advocacy for his or her client. While the testator/client is alive, the lawyer owes him or her a "duty of complete and undivided loyalty." *Lewis v. Star Bank, N.A., Butler Cty.*, 90 Ohio App.3d 709, 630 N.E.2d 418, 421 (1993), *jurisdictional motion overruled*, 68 Ohio St.3d 1473, 628 N.E.2d 1392 (1994). The strict privity rule protects an attorney's obligation to direct his or her full attention to the needs of the client. *Simon*, 512 N.E.2d at 638. An attorney's preoccupation or concern with potential negligence claims by third parties might result in a diminution in the quality of the legal services received by the client as the attorney might weigh the client's interests against the attorney's fear of liability to a third party. *See Simon*, 512 N.E.2d at 638. Second, there exists the danger of placing conflicting duties on an attorney during the estate planning process if a nonclient is permitted to maintain a cause of action against a testator's attorney. John H. Bauman, *A Sense of Duty: Regulation of Lawyer Responsibility to Third Parties by the Tort System*, 37 S. Tex. L. Rev. 995, 1006 (1996). As a result, an attorney's loyalty might become divided between the testator/client and the beneficia-

ries. *See Barcelo v. Elliott*, 923 S.W.2d 575, 578 (Tex.1996). Third, courts fear that absent the strict privity rule there would be no limit as to whom a lawyer would be obligated. *See Ward*, 100 U.S. at 203, 25 L.Ed. at 624. In *Ward*, the Court noted that "[t]he only safe rule is to confine the right to recover to those who enter into the contract; if we go one step beyond that, there is no reason why we should not go fifty." *Id.* Furthermore, parties to a contract for legal services would lose control of their agreement if liability without privity were permitted. Joan Teshima, Annotation, *Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with Legal Duties*, 61 A.L.R.4th 615, 624 (1988). As one commentator noted, the strict privity rule has been retained in some jurisdictions because

> "not only should an attorney know in advance who is being represented and for what purpose, but also the attorney should be able to control the scope of the representation and the risks to be accepted. Imposing liability in favor of nonclients, generally speaking, threatens those interests. In threatening the interests of the attorney, the interests of potential clients may also be compromised; they might not be able to obtain legal services as easily in situations where potential third party liability exists. Before abandoning privity, the courts need a good reason for thinking that the private arrangements are inadequate."

John H. Bauman, *A Sense of Duty: Regulation of Lawyer Responsibility to Third Parties by the Tort System*, 37 S. TEX. L. REV. 995, 1005–06 (1996). Thus, opening attorney-client contracts to the scrutiny of nonclients would place an undue burden on the attorney-client relationship and possibly the legal profession as a whole. *See Joan Teshima, Annotation, Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with Legal Duties*, 61 A.L.R.4th 615, 624 (1988) (noting that "opening attorney-client contracts to third party scrutiny would entail a vast range of potential liability"); *cf. Dickey*, 731 S.W.2d at 583. Although several jurisdictions still, as a general rule, adhere to the traditional strict privity requirement in attorney malpractice cases, some

jurisdictions have either relaxed the requirement in limited situations or abandoned it altogether.

### B. The Balancing of Factors Theory

Forty years ago, the Supreme Court of California began the trend of alternative approaches to the strict privity rule when it first formulated its policy-based balancing of factors theory in *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16, 19 (1958). The California court later modified the balancing of factors theory in the context of an attorney malpractice case in *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962). In *Lucas*, the court addressed the issue of whether the beneficiaries of a will had a cause of action in negligence against the attorney who drafted the will. *Id.* In determining whether an attorney will be held liable to a nonclient, the court noted that it will consider the following factors: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm." *Lucas*, 15 Cal. Rptr. at 823, 364 P.2d at 687. An additional factor considered by the court was whether recognizing liability in such cases would impose an undue burden on the legal profession. *Lucas*, 15 Cal.Rptr. at 824, 364 P.2d at 688. Although the court recognized that the amount of liability in some cases could be "large and unpredictable," the court concluded that no undue burden would be placed on the profession, especially since a conclusion otherwise would result in the innocent beneficiary bearing the loss. *Id.* Despite the lack of privity between the beneficiaries and the attorney who drafted the will, the beneficiaries could maintain an action in tort against the attorney.[5]

---

5. The California court also concluded that intended beneficiaries of a will could maintain an action for breach of contract as third-party beneficiaries where they "lose their testamentary rights because of failure of the attorney who drew the will to properly fulfill his obligations under his contract with the testator." *Lucas v. Hamm*, 56

Some jurisdictions have followed the *Lucas* approach in the will drafting or estate planning context. *See, e.g., Creighton University v. Kleinfeld,* 919 F.Supp. 1421, 1426 (E.D.Cal. 1995); *Auric v. Continental Cas. Co.,* 111 Wis.2d 507, 331 N.W.2d 325, 329 (1983).

This Court has declined to adopt this balancing of factors approach in the past, and we see no valid reason to adopt such a test now. As we noted in *Flaherty,* this approach has not been universally accepted by other jurisdictions. The balancing of factors approach has been criticized as being too broad, *see Pelham v. Griesheimer,* 92 Ill.2d 13, 64 Ill.Dec. 544, 548, 440 N.E.2d 96, 100 (1982), and so unworkable that it has led to "ad hoc determinations and inconsistent results." *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744, 749 (1983). We agree and therefore decline to adopt the balancing of factors approach in the instant cases.

## C. The Third–Party Beneficiary Theory

Maryland courts applied the strict privity rule in attorney malpractice cases without exception until 1972 when this Court recognized the third-party beneficiary theory in an attorney malpractice case, *Prescott v. Coppage,* 266 Md. 562, 296 A.2d 150 (1972). In *Prescott,* Coppage was the receiver for Security Financial Insurance Corporation (Security), a creditor of Maryland Thrift Savings and Loan Company (Maryland Thrift). Coppage sued Medley, the court-appointed receiver for Maryland Thrift, as well as Prescott who was counsel specially appointed by the court " 'to aid [Medley] in the performance of his duties as receiver.' " 266 Md. at 565, 574, 296 A.2d at 152, 156. Although it is unclear whether Coppage brought suit under a tort theory or a contract theory, the subject matter of the suit was a $40,000 debt owed to Security by Maryland Thrift. Coppage alleged that Medley and Prescott improperly distributed Maryland Thrift's assets to lower

---

Cal.2d 583, 15 Cal.Rptr. 821, 825, 364 P.2d 685, 689 (1961), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962). This third-party beneficiary theory will be discussed *infra* in section II.C.

priority creditors instead of paying the balance due on Security's priority claim. *Prescott*, 266 Md. at 565, 296 A.2d at 151. In determining who is a creditor beneficiary, this Court noted that "the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention[ ] are controlling factors." *Prescott*, 266 Md. at 574, 296 A.2d at 156. This Court further noted that the judicial order appointing Medley as receiver made clear that all creditors of Maryland Thrift were third-party beneficiaries and that the court order appointing Prescott "by necessary implication bound him to those creditor beneficiaries." *Id.* Thus, because Prescott was appointed by the court and not retained by Maryland Thrift or Medley, Prescott owed a duty to the court as well as to any beneficiaries the court intended to benefit. This Court then held that the acceptance of the duties by Medley and Prescott entailed in the court order created conditions that gave Coppage standing to sue Prescott as a third-party creditor beneficiary. *Id.*

This Court last addressed an issue of attorney liability to nonclients for professional malpractice in the *Flaherty* case which involved a lawsuit by mortgagors against an attorney on theories of negligence, breach of warranty, and negligent misrepresentation. 303 Md. at 134, 492 A.2d at 627. The Flahertys purchased a home that First Federal Savings and Loan Association (First Federal) financed. *Flaherty*, 303 Md. at 132, 492 A.2d at 626. First Federal retained the firm Weinberg, Michel and Sterns (Weinberg) to represent it at settlement, but the Flahertys did not retain counsel for themselves. *Id.* At settlement, Weinberg assured the Flahertys that they were purchasing the property described in the contract of sale, a representation that the Flahertys subsequently discovered to be inaccurate. *Flaherty*, 303 Md. at 132–33, 492 A.2d at 626. The Flahertys' second amended complaint alleged that " '[t]he hiring of [Weinberg] was intended to benefit the lender as well as the purchasers in that both had identical interests in the property. The plaintiffs were

intended, either expressly or impliedly, to benefit from the defendant attorneys' undertaking in this matter.'" *Flaherty*, 303 Md. at 138–39, 492 A.2d at 629 (brackets in original).

Noting that the third-party beneficiary theory is the sole exception in Maryland to the strict privity rule, this Court explained that the gravamen of an attorney malpractice action "is the negligent breach of a contractual duty." *Flaherty*, 303 Md. at 130, 134, 492 A.2d at 625, 627. Although the third-party beneficiary exception is " 'peculiarly applicable' to contract actions, its scope has a broader range. In our view, the scope of duty concept in negligence actions, *Clagett v. Dacy*[, 47 Md.App. 23, 28, 420 A.2d 1285, 1289 (1980) ], may be analogized to the third party beneficiary concept in the context of attorney malpractice cases." *Flaherty*, 303 Md. at 130, 492 A.2d at 625. Thus, regardless of whether a tort theory or a contract theory is pled, a plaintiff in an attorney malpractice action must first "allege and prove the existence of a duty between the plaintiff and the defendant." [6] *Flaherty*, 303 Md. at 134, 492 A.2d at 627. In order to establish a duty owed by the attorney to the nonclient, the nonclient

"must allege and prove that the *intent of the client to benefit the nonclient was a direct purpose of the transaction*

---

**6.** As we noted earlier, other jurisdictions have adopted the third-party beneficiary approach, permitting an intended beneficiary to maintain an attorney malpractice action in tort and also in contract. *See e.g., Stowe*, 441 A.2d at 84; *Lorraine*, 467 So.2d at 317; *Jewish Hosp. v. Boatmen's Nat. Bank*, 261 Ill.App.3d 750, 199 Ill.Dec. 276, 284, 633 N.E.2d 1267, 1275, *appeal denied*, 157 Ill.2d 503, 205 Ill.Dec. 165, 642 N.E.2d 1282 (1994); *Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987). Such jurisdictions have recognized, however, that the "contractual theory is ' "conceptually superfluous since the crux of the action must lie in the tort in any case; there can be no recovery without negligence." ' " *Lorraine*, 467 So.2d at 31 (citations omitted). At least one jurisdiction has retained the strict privity requirement in malpractice actions based on negligence, limiting the recovery of named beneficiaries to breach of contract actions under a third-party beneficiary theory. *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744, 750-52 (1983)(recognizing a restricted cause of action under RESTATEMENT (SECOND) OF CONTRACTS § 302 for a named legatee of a will as an intended third-party beneficiary of the contract between the testator and the attorney for the preparation of a will.)

*or relationship.* In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party." (Emphasis added).

*Flaherty,* 303 Md. at 130–31, 492 A.2d at 625. In other words, an incidental benefit to a nonclient will not impose a duty upon an attorney. *Flaherty,* 303 Md. at 131 n. 6, 492 A.2d at 625 n. 6. Once a duty to the nonclient is established, he or she then must allege and prove the remaining elements of a negligence cause of action in order to recover against the attorney in negligence. *Flaherty,* 303 Md. at 131, 492 A.2d at 625.

This Court reasoned that the third-party beneficiary exception is narrow in scope, and "[p]roperly applied, this exception will not expose the attorney to endless litigation brought by those who might conceivably derive some indirect benefit from the contractual performance of the attorney and his client." *Flaherty,* 303 Md. at 131, 492 A.2d at 625–26. In addition, in adversarial proceedings, this exception is limited by the Maryland Rules of Professional Conduct, imposing a duty on lawyers to represent clients zealously and generally prohibiting the representation of conflicting interests in a transaction. *Flaherty,* 303 Md. at 131, 492 A.2d at 626.

Turning to the facts of the case, this Court held that the Flahertys could not maintain a cause of action in negligence because they did not employ Weinberg. *Flaherty,* 303 Md. at 134, 492 A.2d at 627. In addition, the Flahertys could not maintain a cause of action for breach of express or implied warranties because they did not allege a contractual relationship with Weinberg, nor did they point to any statute that extended such warranties to them under the circumstances of the case. *Flaherty,* 303 Md. at 135, 492 A.2d at 627. Like the negligence and breach of warranty claims, this Court stated that the attorney must owe a duty to the nonclient in order for the nonclient to recover under a negligent misrepresentation theory. *Id.* We concluded that the Flahertys did allege as a fact that First Federal intended the Flahertys to benefit directly from Weinberg's services as an attorney. *Flaherty,* 303 Md. at 139, 492 A.2d at 629–30. Thus, this Court held

that this allegation was sufficient to survive Weinberg's motion to dismiss even though it would be difficult for the Flahertys to ultimately prove that a direct purpose of the relationship between them and First Federal was to benefit the Flahertys. *Id.* In reaching our decision, we noted that the fact that the Flahertys did not retain separate counsel was inconclusive as to "whether First Federal intended to benefit the Flahertys ... [or] whether that intent was the primary purpose of the transaction or relationship." *Flaherty*, 303 Md. at 137, 492 A.2d at 628. This Court also recognized that conflicts of interest may arise where an attorney represents both the mortgagor and mortgagee, but concluded that the Flahertys had asserted facts in their complaint that raised an inference that no conflict existed between their interests and First Federal's interests. *Flaherty*, 303 Md. at 138, 492 A.2d at 629.

Other jurisdictions have taken similar positions as this Court did in *Flaherty* that, in order for an attorney to owe a duty to a nonclient, the nonclient must show that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship. *See, e.g., Jewish Hosp. v. Boatmen's Nat. Bank*, 261 Ill.App.3d 750, 199 Ill.Dec. 276, 284, 633 N.E.2d 1267, 1275 (noting that the nonclient must prove that the primary purpose and intent of the attorney-client relationship was to benefit or influence the nonclient), *appeal denied*, 157 Ill.2d 503, 205 Ill.Dec. 165, 642 N.E.2d 1282 (1994); *see also Needham v. Hamilton*, 459 A.2d 1060, 1062 (D.C.1983) (holding that a "direct and intended beneficiary" of a will may maintain a legal malpractice action against the attorney who drafted will); *Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987) (noting that an attorney owes a duty of care only to the "direct, intended, and specifically identifiable beneficiaries of the testator as expressed in the testator's testamentary instruments").

In the *Noble* case, the Court of Special Appeals stated that the Flaherty rule is "generally applicable to all third party beneficiary/attorney malpractice claims." Although the *Noble* beneficiaries alleged in their complaint that they were the intended beneficiaries of the contract between the Longs and

Bruce, the intermediate appellate court concluded that such a claim on its own did not satisfy the elements of a cause of action for attorney malpractice. The intermediate appellate court stated that additional elements set forth in *Kirgan*, and later reiterated in *Layman v. Layman*, 84 Md.App. 183, 190, 578 A.2d 314, 317 (1990), were required. Specifically,

"a testamentary beneficiary (or one claiming to be an intended beneficiary) has no cause of action against the testator's attorney for alleged negligence in drafting the will when, as in this case, the will is valid, the testamentary intent as *expressed in the will* has been carried out, and there is no concession of error by the attorney." (Emphasis in original).

*Kirgan*, 60 Md.App. at 12–13, 478 A.2d at 718–19. Similarly, the trial court in *Fauntleroy* applied the *Kirgan* test in reaching its decision.

In *Kirgan*, Mary Kirgan alleged that her friend, Clarence M. Plitt (the testator), had told her that he would change his will in her favor. *Kirgan*, 60 Md.App. at 4, 478 A.2d at 714. Kirgan had referred the testator to her attorney. *Id.* When Plitt died, his bequest to Kirgan left her approximately $7000 worth of furniture and other chattels. *Id.* The will bequeathed the rest of the estate valued at approximately $5 million to a charitable trust and designated Kirgan and First National Bank of Maryland as co-trustees. *Id.* Kirgan filed suit against the attorney alleging, *inter alia*, negligence in the preparation of the testator's will in failing to provide for Kirgan in the will as the testator intended and negligence under a third-party beneficiary contract theory. *Kirgan*, 60 Md.App. at 5, 478 A.2d at 715.

Because of the circumstances of the case, the Court of Special Appeals left open the general question of whether a testamentary beneficiary can maintain a legal malpractice action in Maryland against the testator's attorney for negligence in preparing a will or in supervising its execution, or "whether an action of that nature should be in contract or tort." *Kirgan*, 60 Md.App. at 12, 478 A.2d at 718. The Court

of Special Appeals held that, under the circumstances of the case, Kirgan had "no cause of action against the testator's attorney for alleged negligence in drafting the will . . . when the will was valid, the testamentary intent *as expressed in the will* ha[d] been carried out, and there [was] no concession of error by the attorney." *Kirgan*, 60 Md.App. at 12, 478 A.2d at 718–19. The intermediate appellate court noted that under Maryland Code, Estates & Trusts Article, § 4–102 a will is required to be in writing, signed by the testator, and attested and signed in the testator's presence by two or more credible witnesses. *Kirgan*, 60 Md.App. at 12–13, 478 A.2d at 719. In order to protect the solemnity of a will, the intermediate appellate court further reasoned that, where the language of a will is plain and unambiguous, extrinsic evidence is not admissible "to show that the testator's intention was different from that which the will discloses, because evidence intended to alter the language of a will would violate that statute." *Id.*

Other jurisdictions that prohibit the admission of extrinsic evidence have explained that the rationale for this limitation is to protect the integrity and solemnity of the will as well as the testator's express intent. *Schreiner*, 410 N.W.2d at 683. In addition, if extrinsic evidence is admitted to explain the testator's intent, the risk of misinterpretation "increases dramatically. Furthermore, admitting extrinsic evidence heightens the tendency to manufacture false evidence that cannot be rebutted due to the unavailability of the testator." *Espinosa v. Sparber, Shevin,* et al., 612 So.2d 1378, 1379, 1380 (Fla. 1993). The will is a "legal document that affords people a clear opportunity to express the way in which they desire to have their property distributed upon death." *Id.* As a policy matter, one court concluded that "it is in the public's best interest to protect attorneys from potentially unlimited liability to third parties whose interests may interfere with the attorney's ability to fulfill the duties of undivided loyalty and advocacy owed to his or her client." *Glover v. Southard*, 894 P.2d 21, 24 (Colo.Ct.App.1994).

## III.

Given this background, we now turn to the question of whether the nonclient, testamentary beneficiaries may maintain a cause of action for professional malpractice against the attorneys in the instant cases. The beneficiaries in both cases ask this Court not to follow the *Kirgan* case, as the Court of Special Appeals did, because *Kirgan* is inconsistent with prior decisions of this Court and because it, in effect, creates "virtual immunity" for attorneys who draft wills and provide estate planning advice. Specifically, the beneficiaries assert that the *Kirgan* case severely limits the application of the third-party beneficiary theory in attorney malpractice cases arising out of will drafting and estate planning. Instead, the beneficiaries ask this Court to adopt a rule of foreseeability that would allow an attorney, at the time he or she was hired by the client, to predict the class of persons to whom he or she would be held liable and the scope of any liability. The beneficiaries assert several policy reasons for such a rule, including: 1) a foreseeability rule would provide an incentive for attorneys to exercise greater care and diligence; 2) the *Flaherty* third-party beneficiary rule already sufficiently controls floodgates of litigation by third parties; 3) because mistakes generally do not arise until after the death of the client, an attorney's errors will more likely impact upon nonclients; 4) attorneys should be held accountable for their mistakes; and 5) the attorney through insurance is better able to bear the cost of his or her error than the nonclient. The *Noble* beneficiaries further assert that, even if this Court adopts the *Kirgan* rule, it should not apply to a claim based on negligent estate planning advice.

The *Fauntleroy* beneficiaries offer several alternatives for this Court to adopt instead of *Kirgan*. The first is a test to determine an attorney's liability to a nonclient for negligence under which the nonclient plaintiff must establish that: 1) the plaintiff was a member of an identified class whose injury could be foreseen by a reasonable attorney exercising due care; 2) negligence was actually committed against the original client; and 3) there is no conflict between the plaintiff's

claim and any interest or potential interest of the actual client. Another suggestion is that of RESTATEMENT OF THE LAW GOVERNING LAWYERS § 73 (Tentative Draft No. 8 1997), which provides in pertinent part that an attorney's duty is owed

"(3) to a non-client when and to the extent that:

(a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the non-client; and

(b) such duty would not significantly impair the lawyer's performance of obligations to the client, and the absence of such a duty would make enforcement of these obligations unlikely."

In addition, the beneficiaries offer the "relational" approach proffered by Professor Jay M. Feinman which focuses on the attorney's relationship with the client, as well as with third parties. Jay M. Feinman, *Attorney Liability to Nonclients*, 31 TORTS & INS. L.J. 735, 751–65 (1996). Under the relational approach, the beneficiary of a will should be permitted to prove that the "testator intended to confer a benefit in the absence of proof in the will" and should not be precluded from doing so by a blanket rule such as the strict privity rule. Jay M. Feinman, *Attorney Liability to Nonclients*, 31 TORT & INS. L.J. 735, 756 (1996). Finally, the beneficiaries suggest the agency approach proposed by Professor Geoffrey C. Hazard, Jr., in which the attorney is liable "to a third person, directly or by way of subrogation to the right of the principal, for negligently or intentionally failing to carry out an undertaking on behalf of the principal that was intended to benefit the third person." Geoffrey C. Hazard, Jr., *The Privity Requirement Reconsidered*, 37 S. TEX. L. REV. 967, 993 (1996).

■ We decline the beneficiaries' invitation to create a new rule in Maryland governing attorney liability to nonclients arising out of will drafting or estate planning. For the following reasons, we hold that the traditional rule of strict privity applies in the instant cases, and thus neither the *Noble* beneficiaries nor the *Fauntleroy* beneficiaries may maintain a malpractice action against the attorneys because no employ-

ment relationship existed between the beneficiaries and the attorneys.

In reaching this decision, we must first dispose of the beneficiaries' assertion that they are third-party beneficiaries because the intent of the testators in employing the attorneys and the direct purpose of the attorneys' representation of the testators was to benefit the beneficiaries. We conclude that the third-party beneficiary exception does not apply for the following reasons. First, the *Flaherty* case is distinguishable from the instant case. In *Flaherty*, there was direct contact between the attorney and the third-party beneficiary. Weinberg met with the Flahertys at settlement and made representations, based upon a survey, that the Flahertys were purchasing the property described in the contract of sale and that the dwelling and the well were within the boundary lines indicated in the contract. Weinberg later failed to advise the Flahertys that the well actually encroached upon a neighbor's property, a fact revealed to Weinberg by a second survey completed four weeks after settlement. In the instant cases, it appears that the attorneys did not communicate or meet with the beneficiaries. In addition, the beneficiaries did not rely on representations made by the attorneys as in the *Flaherty* case. A close reading of *Flaherty* also indicates the possibility that there was an assumption of duty by Weinberg. Here, however, there is no evidence that either Bruce or Henry undertook representation of the testators for estate planning on behalf of the beneficiaries. Attorney malpractice cases arising out of will drafting or estate planning generally are very different from the scenario presented in *Flaherty* and require special policy considerations as we shall explain later in this opinion.

In addition, the beneficiaries assert that the area of will drafting and estate planning is best suited for the application of the third-party beneficiary exception because a testamentary beneficiary is by definition the intended beneficiary of the testator's contractual relationship with the attorney who drafted the will. We disagree. As we stated earlier, the client's intent to benefit the nonclient must be a direct purpose

of the transaction or relationship in order for the nonclient to be considered a third-party beneficiary. In cases involving wills, the beneficiary of a will is not necessarily the beneficiary of the attorney-client relationship. The testator/client's intent and purpose in executing a will may not be to benefit the beneficiaries named in the will, but rather to prevent the intestate distribution of assets. In other words, the testator's intent may be 1) to exclude certain individuals who would otherwise inherit the testator's property without a will and to ensure that those individuals are unable to inherit, or 2) to personally provide for distribution of assets rather than leaving distribution to the intestate succession. As the Supreme Court of Virginia noted, "[t]here is a critical difference between being the intended beneficiary of an estate and being the intended beneficiary of a contract between a lawyer and his client." *Copenhaver*, 384 S.E.2d at 596. "A promise to prepare a will pursuant to the instructions of a testatrix states a direct obligation to render a performance beneficial to her, i.e., the creation of a document which would enable her upon her death to effect the transfer of her assets to the beneficiaries named in her instructions." *Stowe v. Smith*, 184 Conn. 194, 441 A.2d 81, 83 (1981). Here, there is no admissible evidence contradicting the supposition that the testators intended their contractual relationships with their attorneys to benefit themselves in planning their estates and in creating and maintaining their wills. Thus, we conclude that the beneficiaries in the instant cases are not third-party beneficiaries of the testators' representation agreements with the attorneys, and the third-party beneficiary exception to the strict privity rule does not apply.

As for *Kirgan*, we agree with the beneficiaries that the *Kirgan* approach is a unique one. The Court of Special Appeals reached the correct result in Kirgan's suit, but we do not subscribe to all of the reasoning of the intermediate appellate court. The *Kirgan* petitioner was the epitome of the "disappointed" beneficiary, and the case exemplifies why the strict privity rule should be maintained in cases involving will drafting or estate planning.

We agree with the reasoning of the Court of Special Appeals in *Kirgan* that extrinsic evidence is not admissible to show that the testator's intent was different from that expressed in the will. Attorney malpractice cases involving nonclients and arising out of will drafting or estate planning require special considerations because the testator/client is dead. If extrinsic evidence were admitted, the potential for fraud and the risk of misinterpreting the testator's intent increase dramatically. *Espinosa*, 612 So.2d at 1379. Such evidence might be pure speculation as to the testator's intent. These same reasons led to the longstanding rule in this state against the reformation of wills. *See Shriners Hospitals v. Md. Nat'l Bk.*, 270 Md. 564, 581, 312 A.2d 546, 555 (1973).

The *Noble* beneficiaries, however, assert that the extrinsic evidence rule does not apply because they are not attacking the will or attempting to modify, vary, or interpret its terms. They concede that it is undisputed as to what the wills provide. The beneficiaries nevertheless allege that Bruce's negligent estate planning advice resulted in the wills being drafted in a manner that created significant, avoidable estate tax liability contrary to the Longs' wishes. The beneficiaries also note that other jurisdictions allow extrinsic evidence. *See, e.g., Creighton University*, 919 F.Supp. at 1427; *Teasdale v. Allen*, 520 A.2d 295, 296 (D.C.1987). We shall not adopt the reasoning of these other jurisdictions because the legal malpractice claims asserted by the beneficiaries in the instant cases are analogous to attacks on the will. The assertion that the beneficiaries are not attacking the will or attempting to modify, vary, or interpret its terms is inaccurate. The suit against Bruce may not involve a direct attack on the will, but it certainly is a collateral attack which, if successful, would result in the reformation of the will. Specifically, the will would be "rewritten" to manifest an intent of the testator to minimize the estate and inheritance taxes for the beneficiaries. The *Fauntleroy* case exemplifies a result that would clearly reform the will in that case. Both of Ms. Jackson's wills provided that the taxes would be paid out of the residuary estate. None of the many codicils changed the

testator's intent in this regard. If the *Fauntleroy* beneficiaries were successful, the will would in effect be rewritten so that the taxes would not be paid out of the residuary estate.

There are also compelling policy reasons for the application of the strict privity rule in both the *Noble* and *Fauntleroy* cases. First, the strict privity rule protects the integrity and solemnity of the will. The beneficiaries are in effect requesting this Court to reform the wills so that the attorney will be responsible for the payment of taxes. If such liability were allowed, the attorney would be paying out-of-pocket for an additional bequest to the beneficiaries not expressed in the will. Although not a persuasive argument, we do note that the attorney's liability is also disproportionate to the cost of the will. The loss to the client is very different from the loss to the beneficiary that may occur as a result of an attorney's negligence in will drafting or estate planning; the client's loss is the cost of redrafting the will, whereas the beneficiary's loss is the amount of the taxes that could have been avoided.

In addition, the strict privity rule protects the. attorney-client relationship. Adopting a new rule that would subject an attorney to liability to disappointed beneficiaries interferes with the attorney's ability to fulfill his or her duty of loyalty to the client and compromises the attorney's ability to represent the client zealously. As demonstrated by the *Noble* case, a potential conflict of interest may exist between the client's interests and the interests of the beneficiaries. The beneficiaries allege that Bruce was negligent in failing to advise the Longs of the bypass trust, a mechanism used to allow both spouses to take advantage of the Unified Credit Against Estate Tax. To simplify, upon the death of the first spouse, up to $600,000 of property in the first spouse's estate can be placed in a bypass trust for the benefit of the surviving spouse. The goal of a bypass trust is to ensure that "this amount of property ultimately passes to the next generation ... without being taxed in the estate of the decedent and ... without being included in the gross estate of the surviving spouse." William P. Streng, 800.V.C. Tax Management Portfolio Estates, Gifts, and Trusts, *Estate Planning* (BNA).

This goal is achieved by structuring the trust so that the "surviving spouse does not have those property and income rights with respect to the trust property which would cause the trust assets to be included in [the surviving spouse's] gross estate upon [the surviving spouse's] death." *Id.* In sum, the surviving spouse can receive income from the trust property, and upon the surviving spouse's death the trust property passes to the beneficiaries free from federal estate tax.

Minimizing estate and inheritance taxes for beneficiaries, however, may not always be the ultimate driving force behind the testator's decisions regarding the provisions contained in his or her will. There may be "compelling nontax reasons not to employ a bypass trust," including flexibility for the survivors. Stuart Kessler, 844.II.C.3 TAX MANAGEMENT PORTFOLIO ESTATES, GIFTS, & TRUSTS, *Estate Tax Credits & Computations* (BNA). One disadvantage of the bypass trust is the loss of some control over trust assets. As one commentator explained,

> "[t]he bypass trust can provide the beneficiary with all the net income earned and access to the principal. But the beneficiary may not have a general power of appointment over the principal. Property to which a beneficiary holds a general power of appointment is includible in the beneficiary's estate. Beneficiaries, however, may hold limited or special powers of appointment over the eventual disposition of principal and still avoid inclusion in their estates." (Footnote omitted).

*Id.* The creation of a bypass trust would have prevented Ms. Long from transferring her real property to Thomas F. Long and Lorraine Kulyncyz without destroying the trust or causing Ms. Long severe tax consequences. Thus, a conflict of interest would exist for Bruce between the client's desire to retain control over the property during her lifetime and the beneficiary's desire to place the property in a bypass trust in order to maximize the size of the estate. Application of the strict privity rule would ensure that will drafting and estate planning attorneys "may in all cases zealously represent their

clients without the threat of suit from third parties compromising that representation." *Barcelo*, 923 S.W.2d at 578–79.

The strict privity rule also protects attorney-client confidentiality. Under Maryland Lawyers' Rule of Professional Conduct 1.6(b)(3), an attorney may disclose confidential information relating to the representation of a client "to the extent the lawyer reasonably believes necessary ... to respond to allegations in any proceedings concerning the lawyer's representation of the client." An attorney, however, should not be placed in the position where he or she would have to reveal a testator/client's confidences in an attorney malpractice action asserted by a nonclient beneficiary. For example, in the will drafting context, a testator/client may tell a relative that he or she will inherit part of the testator's estate. In reality, the testator/client intends that this relative inherit nothing because the testator/client secretly believes the relative is an evil person. The testator/client confides this secret belief to his or her estate planning attorney and requests the attorney to draft a will that leaves nothing to the relative. Allowing a nonclient beneficiary to maintain a cause of action against an attorney for professional malpractice may require the attorney to reveal confidences the testator would never want revealed.

Furthermore, the beneficiaries' alleged damages in the instant cases constitute purely economic losses. There is no risk of death or serious personal injury generated by any alleged negligent conduct by Bruce or Henry. Thus, Bruce and Henry owed no tort duty to the beneficiaries for mere economic losses absent contractual privity or its equivalent.

The beneficiaries, in the instant cases, posit that an attorney, who commits an error while drafting a will or planning an estate, will not be held accountable if the beneficiaries have no cause of action. That is not necessarily so. Although we need not decide the issue in the instant cases, a testator's estate might stand in the shoes of the testator and meet the strict privity requirement. *See Espinosa*, 612 So.2d at 1380. Thus, where limitations have not run, we do not foreclose the

possibility that a testator during his or her lifetime or the testator's estate may have an attorney malpractice action for negligent acts committed by the attorney while representing the testator. Damages, however, may be limited to the attorney's fee.

Applying the law to the instant cases, we hold that the Court of Special Appeals' judgment in *Noble* affirming the trial court's granting of summary judgment was proper because the *Noble* beneficiaries did not employ Bruce and thus could not maintain an action against Bruce as a matter of law. As for the *Fauntleroy* case, to survive a motion to dismiss, the plaintiff need only allege facts that, if proven, would entitle him or her to relief. *Flaherty*, 303 Md. at 136, 492 A.2d at 628. If the pleadings do not as a matter of law allege sufficient facts to entitle a party to the relief sought on the claim, a court may grant a motion to dismiss for failure to state a claim pursuant to Maryland Rule 2–322(b). *See Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 333, 624 A.2d 496, 498 (1993). We hold that the *Fauntleroy* beneficiaries failed to allege as fact an employment relationship with Henry, and thus the complaint failed to allege facts sufficient to satisfy the first element of an attorney malpractice action as a matter of law.

In sum, if this Court followed any of the broad approaches suggested by the beneficiaries, we would undermine the important policy rationales behind our longstanding strict privity rule. The beneficiaries in the instant cases would have this Court maximize the testators' estates by holding the attorneys liable for the estate and inheritance taxes borne by the beneficiaries, *i.e.*, purely economic losses. As we see it, the beneficiaries fall within the realm of the disappointed beneficiary to whom the strict privity rule applies without exception. We agree with the Supreme Court of Texas that "the greater good is served by preserving a bright-line rule which denies a cause of action to all beneficiaries whom the attorney did not represent." *Barcelo*, 923 S.W.2d at 578. We therefore affirm the judgments of the lower courts in both cases.

760

JUDGMENT OF THE COURT OF SPECIAL APPEALS IN NO. 7 AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.

JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY IN NO. 55 AFFIRMED. COSTS TO BE PAID BY PETITIONER.