**Philip J. GOODMAN, Appellant,**

v.

**GOLDBERG & SIMPSON, P.S.C.; Steven A. Goodman; and Wayne F. Wilson, Appellees.**

**No. 2008–CA–000921–MR.**

Court of Appeals of Kentucky.

Oct. 16, 2009.

Rehearing Denied Feb. 25, 2010.

Discretionary Review Denied by Supreme Court Nov. 10, 2010.

Katherine K. Yunker (argued), Theodore E. Cowen, Lexington, KY, for appellant.

Raymond G. Smith (argued), Louisville, KY, for appellees, Goldberg & Simpson, P.S.C. and Wayne F. Wilson.

Richard G. Segal (argued), Louisville, KY, for appellee, Steven A. Goodman.

Before ACREE and LAMBERT, Judges; HARRIS,[1] Senior Judge.

## OPINION

HARRIS, Senior Judge.

Philip Goodman appeals from a summary judgment granted in favor of Goldberg & Simpson, P.S.C., Steven A. Goodman, and Wayne F. Wilson dismissing his tort claims relating to the distribution of assets from the estates of Leah and Lawrence Goodman. After a careful review of the record, briefs, and oral arguments, we are persuaded that there are no genuine issues of material fact. Accordingly, we affirm.

Leah and Lawrence Goodman were the parents of appellant, Philip Goodman, and appellee, Steven Goodman. Leah Goodman died testate in 1977. Lawrence Goodman died testate in 2004. During their lifetimes, the Goodmans operated a jewelry store known as the Jewel Box. When Leah died, Lawrence was appointed executor of her estate. At this time, Steven was a third-year law student and assisted with the administration of Leah's estate. According to the terms of Leah's will, she

---

1. Senior Judge William R. Harris sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

made a specific bequest of her undivided one-half (1/2) interest in a coin collection to Philip and Steven. The remainder of the estate was divided into two equal parts. Leah devised the assets allocated in part I to Lawrence. The other assets in part II were distributed in trust for Lawrence with income to him for life. When Lawrence died, the remaining balance in part II was to be distributed in equal shares to Philip and Steven.

On August 12, 1983, Philip signed: (1) a first and final Settlement regarding Leah's will that was filed with the probate court; (2) an agreement to terminate the trust established under Leah's will; and (3) a release of any and all claims concerning Leah's trust. It is undisputed that these documents were signed under oath and that Philip understood each document. However, Philip now alleges that he made a side agreement with Lawrence at that time, which consisted of Lawrence agreeing to leave half of his estate to Philip and half to Steven. Philip continued to believe that he and Lawrence had verbally agreed to such a distribution. Philip also alleged that Steven was aware of the oral agreement and that both Lawrence and Steven continued making representations regarding such a distribution until the time of Lawrence's death in 2004.

The equal distribution of Lawrence's estate among Philip and Steven was impossible because Lawrence married Evelyn Goodman in 1981. Lawrence and Evelyn executed a prenuptial agreement immediately before the wedding. According to Steven, it was on display for everyone in attendance to see. The prenuptial agreement expressly provided that Evelyn would receive the home, life insurance proceeds, and at least one-third of Lawrence's estate. Between 1985 and 2002, Lawrence executed six wills, all of which left Lawrence's entire estate to Evelyn with the exception of specific items that were left to Philip and Steven. In late 2001, appellee, Wayne Wilson, prepared separate wills for Lawrence and Evelyn and a revocable trust agreement for Lawrence. These documents were executed on January 2, 2002. After Lawrence died in 2004, Philip alleged that he was informed for the first time that a revised will had been prepared by Goldberg & Simpson, the firm where both Steven and Wilson worked as attorneys. Philip contends that until Lawrence died, Steven and Lawrence continued to make the same representations they had made for over twenty years, viz., that the will had not been changed and that Philip and Steven would each receive one-half of the estate.

On March 16, 2005, Philip filed suit against Steven, Wilson, and Goldberg & Simpson alleging: (1) fraud and intentional misrepresentation; (2) intentional interference with contract; (3) professional negligence and legal malpractice; (4) breach of fiduciary duty; (5) intentional infliction of emotional distress; and (5) violations of the rules of professional conduct. The trial court entered summary judgment dismissing all of Philip's claims on December 3, 2007. Philip filed a motion to vacate the judgment, which the trial court denied on April 22, 2008. This appeal from the summary judgment and the order denying the motion to vacate the judgment followed.[2] Additional facts will be developed as necessary.

■ Philip first argues that summary judgment was inappropriate because the intentional tort claims of fraud and interference with contract against Steven are supported by evidence in the record, which

**2.** We also note that in his brief in this Court, Philip has waived his claims against Wilson and Goldberg & Simpson except for professional negligence.

demonstrates the existence of genuine issues of material fact.

The standard of review for summary judgments is well-established.

Summary judgment is appropriate when " 'as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.' " *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 483 (Ky.1991) (quoting *Paintsville Hospital Co. v. Rose,* 683 S.W.2d 255, 256 (Ky. 1985)). In using the word "impossible" in *Steelvest,* we have acknowledged that it "is used in a practical sense, not in an absolute sense." *Perkins v. Hausladen,* 828 S.W.2d 652, 654 (Ky.1992). Furthermore, the party opposing summary judgment "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Steelvest,* 807 S.W.2d at 481 (internal quotations omitted) (citation omitted).

.... This Court has often stated that "speculation and supposition are insufficient to justify a submission of a case to the jury, and that the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation." *Chesapeake & Ohio Ry. Co. v. Yates,* 239 S.W.2d 953, 955 (Ky.1951).

*O'Bryan v. Cave,* 202 S.W.3d 585, 587–88 (Ky.2006). "Because summary judgments involve no fact finding, this Court reviews them *de novo,* in the sense that we owe no deference to the conclusions of the trial court." *Blevins v. Moran,* 12 S.W.3d 698, 700 (Ky.App.2000).

Philip contends that Steven made fraudulent representations about Lawrence's estate plans and that his allegation creates a genuine issue of fact.

 In an action for fraud in Kentucky,

the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury.

*United Parcel Service Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999). It is also a well-settled rule that "a misrepresentation to support an allegation of fraud must be made concerning a present or-pre-existing fact, and not in respect to a promise to perform in the future." *Filbeck v. Coomer,* 298 Ky. 167, 182 S.W.2d 641, 643 (1944).

The representations regarding Lawrence's estate that Philip alleges Steven made began in the mid–1980s and continued after Lawrence's death in 2004. The alleged representations all refer to the future act of Philip and Steven each receiving one-half of Lawrence's estate. Additionally, there is no evidence whatsoever that the alleged representations were made with inducement to be acted upon. Even if Steven did make the alleged representation that he and Philip would each receive one-half of Lawrence's estate, Philip has provided no evidence that he relied upon these representations to his detriment other than he would have initiated criminal proceedings against Lawrence.

 Next, Philip argues that summary judgment was inappropriate on his claim of intentional interference with contract. We disagree because there was no evidence of the existence of a contract between Philip and Lawrence.

KRS 394.540(1) states:

A contract to make a will or devise, or not to revoke a will or devise or to die intestate, if executed after June 16, 1972, **can be established only** by:

(a) Provisions of a will stating material provisions of the contract;

(b) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

(c) A writing signed by the decedent evidencing the contract.

(Emphasis added).

█ Philip maintains that he and Lawrence Goodman entered into an oral contract whereby Lawrence agreed to devise one-half of his estate to Philip in consideration of Philip's forbearance to pursue criminal and civil charges against Lawrence related to the administration of Leah Goodman's estate. KRS 394.540(1) clearly states that a contract to make a will cannot be created orally. We further note that even if the purported agreement had conformed to the requirements of KRS 394.540(1), it would nevertheless be void as against public policy.

"Agreements calculated to impede the regular administration of justice are void, as against public policy, without reference to the question whether improper means are contemplated or employed in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country. Within the condemned category are agreements to compound a crime or a penal action; ... *agreements to stifle or prevent a criminal prosecution,* or to unduly influence its termination; ... agreements to conceal the fact that a party is breaking the law; or agreements interfering with the proper discharge of the duties of a judicial officer or person charged with the enforcement of the law. * * * All

agreements, it is said in a recent case, relating to proceedings in court, civil or criminal, which may involve anything inconsistent with the impartial course of justice, are void, although not open to the charge of actual corruptness, and regardless of the good faith of the parties or of the fact that no evil resulted therefrom." *Kimbrough v. Lane,* [74 Ky. 556] 11 Bush. 556 [ (1875) ]; *Barclay v. Breckinridge,* [61 Ky. 374] 4 Metc.[Met.] 374 [ (1863) ]; *Gardner v. Maxey,* [48 Ky. 90] 9 B. Mon. 90 [ (1849) ]; *Swan v. Chandler,* [47 Ky. 97] 8 B. Mon. 97 [ (1847) ]; *Miller v. Payne,* 7 Ky. Law Rep. 288 [ (1885) ]; *Wheeler, etc., Mfg. Co. v. Hord,* 4 Ky. Law Rep. 240 [ (1882) ].

*Jones v. Henderson,* 189 Ky. 412, 225 S.W. 34, 36 (1920) (emphasis added). Therefore, the claim for intentional interference with the performance of a contract must fail as a matter of law because there was no contract.

Philip cites *Lonnie Hayes & Sons Staves, Inc. v. Bourbon Cooperage Co.,* 777 S.W.2d 940, 942 (Ky.App.1989), in support of the proposition that the enforceability of a contract is not a precondition to a tort action regarding the performance of a contract. This argument is misplaced because *Lonnie Hayes* dealt with the Statute of Frauds, KRS 355.2–201(1). The Statute of Frauds concerns the enforceability of certain types of contracts whereas KRS 394.540(1) specifically concerns the formation of contracts to execute a will. The supposed contract in this case did not conform to the requirements of KRS 394.540(1). According to the clear language of that statute, no contract was formed. By way of comparison, the Statute of Frauds simply prohibits the enforceability of certain otherwise properly formed contracts that are not in writing. In the *Lonnie Hayes* case, the contract at

issue was valid, but unenforceable by virtue of the Statute of Frauds. In the present case, there was no valid contract as a matter of law.

Next, Philip argues that there was sufficient evidence to preclude summary judgment on his claim that Steven aided and abetted Lawrence's breach of fiduciary duty to Philip. Philip argues that Lawrence owed a fiduciary duty to him as a beneficiary of Leah Goodman's estate. Philip argues that this fiduciary duty continued after he had released his claims against the estate because of the oral agreement.

Philip signed a release of all claims involving the trust of Leah Goodman. He received the $20,000.00 to which he was entitled. Philip admitted that he did, in fact, sign the document. As stated above, there was no contract for Lawrence Goodman to devise one-half of his estate to Philip. Lawrence did not owe Philip a fiduciary duty as an intended beneficiary or otherwise. Therefore, the claim for aiding and abetting breach of fiduciary duty must fail as a matter of law because there was no duty.

Next, Philip argues that the evidence precluded summary judgment on his claim for the tort of outrage. The elements for the tort of outrage are as follows:

1. The wrongdoer's conduct must be intentional or reckless;

2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;

3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and

4. The emotional distress must be severe.

*Kroger Co. v. Willgruber,* 920 S.W.2d 61, 65 (Ky.1996). The issue of whether conduct is so outrageous as to permit recovery is a question of law for the court to decide. *Goebel v. Arnett,* 259 S.W.3d 489, 493 (Ky. App.2007).

> [T]he tort is not available for "petty insults, unkind words and minor indignities." Nor is it to compensate for behavior that is "cold, callous and lacking sensitivity." Rather, it is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees.

*Id.* (internal citations omitted).

We have reviewed the voluminous record in this case.[3] The only support for Philip's claim is his own allegation. There was no contract, much less any concrete evidence to establish that Steven committed any wrongdoing against Philip, intentionally or otherwise. There is no evidence that Steven attempted to cheat Philip out of his inheritance or that Steven unduly influenced Lawrence's will. In fact, the two brothers received substantially the same amount under Lawrence's will. Philip never challenged Lawrence's will directly. Moreover, it was Lawrence's prerogative to dispose of his estate as he saw fit. This is a case involving an unfortunate estrangement among family members. Given the circumstances of the entire case, as a matter of law the conduct alleged does not sink to the depths required to constitute outrageous conduct.

Next, Philip argues that Steven breached his fiduciary duty as Philip's attorney and also committed malpractice.

---

**3.** Including 2,380 pages of trial record, 10 volumes of depositions, 2 videotapes, 1 volume of sealed pleadings, 1 volume of exhibits; the parties' briefs contain 88 appendices.

In *Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky.App.1978), this Court stated:

> The relationship of attorney-client is a contractual one, either expressed or implied by the conduct of the parties. The relationship is generally that of principal and agent; however, the attorney is vested with powers superior to those of any ordinary agent because of the attorney's quasi-judicial status as an officer of the court; thus the attorney is responsible for the administration of justice in the public interest, a higher duty than any ordinary agent owes his principal. Since the relationship of attorney-client is one fiduciary in nature, the attorney has the duty to exercise in all his relationships with this client-principal the most scrupulous honor, good faith and fidelity to his client's interest.

Beyond Philip's bare supposition, there is no evidence that Steven acted as his attorney. There was no written contract to perform legal services. The conduct of Philip and Steven does not support the implication of an attorney-client relationship. The legal service which Philip alleged that Steven provided consisted of occasional assurances that they would each receive one-half of Lawrence's estate. There is no evidence that Steven "brokered" the alleged oral agreement. There is evidence that Philip harbored a deep mistrust of Steven. They only spoke or met on rare occasions. There is no evidence that any discussion regarding his father's estate was anything more than a conversation among family members. Therefore, because there was no attorney-client relationship, the claim of legal malpractice against Steven must fail.

Philip next argues that attorney Wilson and Goldberg & Simpson also breached fiduciary duties to him and committed malpractice. Philip argues that the alleged misdeeds of Steven should be imputed to Goldberg & Simpson under the theory of respondeat superior. We disagree because there is no record evidence to support these claims.

As stated above, Philip did not have an attorney-client relationship with Steven. Therefore, Philip did not have any legal relationship with Goldberg & Simpson. Further, there is no indication whatsoever that any of the alleged wrongdoing committed by Steven was within the scope of his employment with Goldberg & Simpson. It is undisputed that Wilson had no knowledge of the purported agreement between Philip and Lawrence Goodman. None of Lawrence's prior wills reference any agreement. Wilson and Evelyn Goodman both testified that the will reflected Lawrence's intent. Lawrence signed the will. The probate court accepted Lawrence's will and Philip never challenged the will directly. There was no evidence that any person other than Wilson drafted Lawrence's will. There is no evidence that Wilson or Goldberg & Simpson had any knowledge of the purported agreement. Moreover, Wilson and Goldberg & Simpson owed a fiduciary duty to Lawrence, not to Philip.

Next, Philip argues that Goldberg & Simpson owed a duty to him as an intended third-party beneficiary of Lawrence's will. We disagree.

Attorneys may be held liable for professional negligence where third parties were the intended beneficiaries of their legal representation. *Hill v. Willmott*, 561 S.W.2d 331, 334 (Ky.App.1978). However, in such cases, the attorney's services must have been "primarily and directly intended to benefit" the third party. *American Continental Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12, 14 (Ky.App.1998).

We cannot conclude that Goldberg & Simpson's services to Lawrence were primarily and directly intended to benefit Philip. Goldberg & Simpson's service to Lawrence consisted of drafting a will that would give effect to his wishes regarding the disposal of his estate. The evidence in this case overwhelmingly demonstrates that this occurred. Philip simply did not receive what he had hoped for from his father's estate. Lawrence's will was never challenged. There is no evidence of any undue influence. The only evidence indicating that Goldberg & Simpson had any knowledge of Philip and Lawrence's purported agreement was Philip's assertion that Lawrence should have told them about it. Summary judgment was appropriate because there is no affirmative evidence in support of this claim beyond mere supposition.

Finally, Philip argues that summary judgment was premature because the trial court entered judgment prior to the completion of discovery. The record reveals otherwise. Philip filed his complaint on March 16, 2005. After two years, the appellees moved for summary judgment. The trial court allowed another six months of discovery before ruling on the motion. The record in this case is copious, containing approximately 4,000 pages of deposition testimony and sixteen volumes of pleadings.[4] Philip had the opportunity to supplement the record and did, in fact, do so in his motion to vacate the trial court's judgment. Philip argues now that there is significant information that he has not yet been able to obtain through discovery, but does not specify what that information would be. Summary judgment was timely and appropriate because there were no genuine issues of material fact.

For the reasons noted above, the summary judgment entered in Fayette Circuit Court on December 3, 2007, and the order denying the motion to vacate judgment entered on April 22, 2008, are affirmed.

ALL CONCUR.