*Madelyn Bennett, Individually and as Successor Trustee of the Pauline A. Bennett Revocable Living Trust v. Thomas A. Gentile*, No. 25, September Term, 2023. Opinion by Gould, J.

**ATTORNEY MALPRACTICE – STRICT PRIVITY RULE**

The Supreme Court held that the strict privity rule set out in *Noble v. Bruce*, 349 Md. 730 (1998), is still good law. Applying the doctrine of stare decisis, the Supreme Court held that the strict privity rule applies in legal malpractice cases when a beneficiary under the inter vivos trust sues the attorney who advised a decedent in the estate planning context.

**ATTORNEY MALPRACTICE - THIRD-PARTY BENEFICIARY**

The Supreme Court reviewed *Noble v. Bruce*, 349 Md. 730 (1998), and *Ferguson v. Cramer*, 349 Md. 760 (1998), and concluded that one's status as a testamentary beneficiary does not entitle that person to claim third-party beneficiary status for claims against the drafting attorney. Rather, under *Noble*, the presumption is that a mere testamentary or trust beneficiary is not a third-party beneficiary. But *Noble* does not foreclose the possibility that the presumption against third-party beneficiary status cannot be overcome by allegations and proof of sufficient facts showing that the client's intent to benefit the beneficiary was the direct purpose of the transaction or relationship.

Circuit Court for Montgomery County
Case No.: 481150V
Argued: March 5, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 25

September Term, 2023

_____

MADELYN BENNETT,
INDIVIDUALLY AND AS SUCCESSOR
TRUSTEE OF THE PAULINE A.
BENNETT REVOCABLE LIVING TRUST

v.

THOMAS A. GENTILE

_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Gould, J.

_____

Filed: August 12, 2024

* Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In this legal malpractice case by the beneficiary of an inter vivos trust against the drafting attorney, we are mainly asked to abandon or relax the rule—known as the "strict privity rule"—under which "a third party not in privity with an attorney has no cause of action against the attorney for negligence in the absence of fraud or collusion." *Noble v. Bruce*, 349 Md. 730, 738 (1998). Alternatively, the beneficiary asks us to hold that she can proceed against the attorney on a third-party beneficiary theory. As explained below, we hold that the strict privity rule under *Noble* is still good law and that, on the undisputed facts, the beneficiary does not have a claim against the attorney as a third-party beneficiary.

I

A

A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title is held to equitable duties to deal with the property for the benefit of another person[.]" *Klein v. Bryer*, 227 Md. 473, 477 (1962). A trust is created by a "settlor": The person who contributes property to the trust. MD. CODE ANN., EST. & TRUSTS ("ET") § 14.5-103(w)(1) (1974, 2022 Repl. Vol.); RESTATEMENT (THIRD) OF TRUSTS § 3 ("RESTATEMENT") (Am. L. Inst. 2003, June 2024 Update). The trust property is held by the "trustee" for the benefit of one or more "beneficiaries." RESTATEMENT § 3.

A trust may be created for any legal purpose. *Klein*, 227 Md. at 476. A settlor, trustee, and beneficiary are all required for the creation of a trust. *Waesche v. Rizzuto*, 224 Md. 573, 583 (1961). The settlor may create a trust either by will or, as here, inter vivos. RESTATEMENT § 3. Either way, the trust may be created through a "[t]rust instrument," which is defined as "an instrument executed by the settlor that contains the terms of the

trust, including amendments to the trust." ET § 14.5-103(bb). The phrase "terms of the trust" "means the manifestation of the intent of the settlor regarding the provisions of a trust as expressed in the trust instrument or as may be established by other evidence that would be admissible in a judicial proceeding." ET § 14.5-103(aa). The terms of the trust can also, if the settlor so chooses, reserve the right to amend the terms or revoke the trust altogether. *See Vito v. Grueff*, 453 Md. 88, 93-94 (2017); AMY MORRIS HESS ET AL., BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 1 (2023).

B

In 2015, Madelyn Bennett's[1] mother, Pauline Bennett, age 91, retained Respondent Thomas Gentile, Esquire, to prepare her estate planning documents. Mr. Gentile prepared a trust instrument memorializing the terms of the Pauline A. Bennett Revocable Living Trust ("Trust"), which Pauline executed on October 30, 2015 ("2015 Instrument"). Pauline wore three hats under the 2015 Instrument: "Settlor," "Trustee," and "Beneficiary." The 2015 Instrument was broken down into nine sections, each with one or more subsections.

In subsection 1.02, Pauline stated that her intention as Settlor was "to transfer certain real and [personal property] into this trust" and that "[t]he Trustee hereby agree[s] to hold any such property, IN TRUST, on the terms set forth in this instrument." That subsection also specifically identified two properties to be transferred: 11605 Fillmore Drive in Silver Spring ("Fillmore") and 4715 Wissahican Avenue in Rockville ("Wissahican"). On the same day she signed the 2015 Instrument, Pauline also signed deeds to transfer Fillmore

---

[1] To assist the reader in keeping track of the parties, we refer to the Bennett family members by their first names. In doing so, we intend no disrespect.

and Wissahican to herself, as Trustee under the Trust. Both deeds were duly recorded. This dispute concerns the disposition of Wissahican upon Pauline's death.

Subsection 2.01 of the 2015 Instrument stated that until her death, Pauline as Settlor "shall utilize" the Trust's property as Trustee for her benefit, with just one exception: Wissahican could be used solely for the benefit of Pauline's daughter, Audrey Bennett-Eney.

Subsection 3.01 directed the disposition of the Trust's assets upon Pauline's death with this introductory clause: "Upon the death of Settlor, the Successor Trustee shall distribute the real property in the trust, and any personal property, and any property and funds later added to the trust corpus, as follows[.]" The subsections that followed instructed the Trustee to distribute: (a) Wissahican and its contents to Audrey; (b) Fillmore to Pauline's son, Matthew Bennett, and to Madelyn; (c) Fillmore's contents "equitably" to Audrey, Madelyn, and Matthew; and (d) "any other funds and property of the trust" in equal shares to Audrey, Madelyn, and Matthew.

In subsection 7.01 of the 2015 Instrument, Pauline appointed herself to serve as the "Initial Trustee" and Madelyn to serve as "Successor Trustee" upon Pauline's "death or disability."

C

Pauline executed a new trust instrument in May 2017 called the "Revised Pauline A. Bennett Revocable Living Trust" ("2017 Instrument"), also prepared by Mr. Gentile. This instrument contained the same nine sections and their subsections as its predecessor. Many of these provisions were untouched, including the provisions regarding Wissahican.

3

But the 2017 Instrument also made some significant changes. Subsection 1.02 was changed to acknowledge that Pauline had transferred the property as contemplated in the prior version, and it retained the provision stating that she "agree[s] to hold any such property, IN TRUST, on the terms set forth in this instrument." Also, by that time, Matthew had died, so the provisions addressing Fillmore and its contents were modified to replace Matthew with Pauline's grandson, Jonathan. Audrey was added as a Successor Trustee to serve jointly with Madelyn.

D

In 2019, while temporarily living in a nursing facility, Pauline learned that Audrey had withdrawn money from Pauline's bank accounts, used Pauline's credit cards without authorization, and mismanaged Pauline's money. In November 2019, Pauline expressed these concerns and others to Mr. Gentile, including her fear that she lacked sufficient funds to pay for home nursing care. She told Mr. Gentile that she needed to sell Wissahican to pay for that care. Recall that under subsection 2.01, as Trustee, Pauline was required to "utilize" Wissahican "for the benefit" of Audrey, so an amendment to the 2017 Instrument would be required to use that property for her benefit, that is, to sell Wissahican and use the proceeds for her own needs. Pauline asked Mr. Gentile to adjust her estate planning documents accordingly and told Mr. Gentile "don't put anything about [Wissahican] going to Audrey."

Mr. Gentile prepared a new trust instrument called the "Amended Revised Pauline A. Bennett Revocable Living Trust," which Pauline signed on November 20, 2019 ("2019 Instrument"). This version contained the same nine sections as the two previous ones, again

4

with most of the provisions unchanged. Subsection 2.01 was amended by removing the clause that required Pauline to use Wissahican for Audrey's benefit.

In addition, subsection 3.01 was changed substantially. The provision in subsection 3.01 calling for Audrey to receive Wissahican upon Pauline's death was removed. The subsections disposing of Fillmore and "any other funds and property of the trust not listed above" were changed to remove Audrey and Jonathan as beneficiaries, leaving Madelyn as the sole beneficiary under those clauses. And, under subsection 7.01, Audrey was removed as a Successor Trustee, leaving Madelyn as the sole Successor Trustee.

E

Pauline died on December 31, 2019, and Madelyn became the Successor Trustee of the Trust. A dispute arose between Madelyn and Audrey over the ownership of Wissahican. Audrey believed she was entitled to Wissahican due to a deed, signed by Pauline in November 2019, that would have transferred Wissahican to Audrey. After Pauline executed the deed, and due to her concerns about Audrey's conduct, Pauline instructed Mr. Gentile not to deliver it to Audrey, and the deed was never delivered or recorded. In January 2020, Audrey's counsel asked Mr. Gentile to record the deed or deliver it to Audrey, but Mr. Gentile refused.

Madelyn, as Trustee, filed a four-count complaint in the Circuit Court for Montgomery County on April 3, 2020. Count One was a claim to quiet the title to Wissahican. Count Two, captioned "Waste," sought damages from Audrey for allegedly neglecting Wissahican, and allowing it to fall into disrepair to the point that it became rat-infested. Count Three, captioned, "Wrongful Taking," sought damages because of

5

Audrey's alleged taking of Pauline's personal property while Pauline was confined to a nursing home, and Count Four, captioned "Detinue in the Alternative," sought the return of the personal property as an alternative remedy to damages.

Over the ensuing 26 months, many pleadings were filed. In June 2020, before her quiet title action had been resolved, Madelyn, as Trustee, contracted to sell Wissahican to third-party buyers. The contract purchasers and Mr. Gentile were made parties in one or more pleadings.[2] The details of each count in each pleading are not necessary to frame the issues before us. We can group the relevant claims into two categories: (1) claims that turned on whether Wissahican belonged to Madelyn or Audrey upon Pauline's death; and (2) if Wissahican was determined to belong to Audrey, claims that turned on whether Mr. Gentile was liable to Madelyn, either as a Trustee or in her individual capacity, for allegedly negligently preparing the 2019 Instrument.

The circuit court resolved the first question in Audrey's favor on summary judgment. Construing the terms of the 2017 Instrument and 2019 Instrument, the court held that the provisions regarding Wissahican in the former were untouched by the latter, which meant that the disposition of Wissahican was governed by the 2017 Instrument—so the property went to Audrey.

---

[2] Audrey was the first to sue Mr. Gentile, alleging primarily that he, along with Madelyn, took advantage of Pauline's frail state of mind to cut Audrey out of any inheritance. Audrey's claims against Mr. Gentile were eventually dismissed on summary judgment.

Madelyn sought en banc review by the circuit court under Maryland Rule 2-551.[3]

The en banc panel affirmed the summary judgment entered in Audrey's favor on that issue.[4]

Now to the claims that bring this matter before us. Having lost the battle over Wissahican to Audrey, Madelyn pursued her claims against Mr. Gentile. Madelyn argued that Pauline intended that Wissahican or any remaining proceeds from its sale would, along with all other Trust property, go to her upon her mother's death. She alleged that but for Mr. Gentile's negligent drafting of the 2019 Instrument, Wissahican or its sales proceeds would have been distributed to her upon Pauline's death. She argued that Mr. Gentile admitted under oath that he had made a drafting mistake by failing to specifically provide for the transfer of Wissahican or its sales proceeds to Madelyn in the 2019 Instrument.[5] To substantiate her claim of negligent drafting, Madelyn relied on the circuit court's

---

[3] The parties contested whether the court's resolution was immediately appealable. That was resolved in Madelyn's favor, as the en banc panel resolved the matter on the merits. Whether it was, in fact, immediately appealable is not before us, and we note that the appeal that brings this matter before us was from a final judgment, so jurisdiction in this Court is not an issue.

[4] The en banc panel also recognized that Madelyn, as Trustee—and under the mistaken belief that Wissahican belonged to her under the 2019 Instrument—contracted to sell Wissahican to third-party buyers. The en banc panel remanded the case for the circuit court to determine whether that transaction, and the improvements Madelyn made to Wissahican to prepare the property for sale, served Audrey's best interest as beneficiary. On remand, the court answered that question in the affirmative and determined that Audrey was entitled to the net proceeds of the sale, that is, the sale price less the costs of renovations and cost of sale.

[5] We reviewed the testimony on which Madelyn bases this assertion. We do not agree that Mr. Gentile's testimony constituted an admission of a drafting mistake. And we do not take a position on whether the circuit court correctly interpreted the trust instruments when it concluded that the 2017 Instrument governed the distribution of Wissahican upon Madelyn's death.

determination, confirmed by the en banc panel, that the provisions of the 2017 Instrument regarding Wissahican remained in effect when Pauline signed the 2019 Instrument.

Madelyn sought damages in her capacity as Trustee as well as in her individual capacity. As Trustee, Madelyn sought indemnification from Mr. Gentile for any damages awarded to the third-party buyers and compensatory damages consisting of the attorneys' fees and litigation costs that she incurred as Trustee in the litigation over title to Wissahican. She also sought compensatory damages equal to the sales price for Wissahican so that, she alleged, she could distribute the same to herself as the beneficiary.

In her individual capacity, Madelyn claimed that she was an intended third-party beneficiary of the attorney-client contract between Pauline and Mr. Gentile, that but for Mr. Gentile's negligence, Wissahican would have been hers, and that she was therefore entitled to compensatory damages.

Each claim was resolved in Mr. Gentile's favor on summary judgment, in two stages. In the first stage, the circuit court denied Madelyn's motions for summary judgment on her claims.

In the second stage, the circuit court granted Mr. Gentile's motion for summary judgment as to Madelyn's claims. In two thorough and well-reasoned opinions (one for the first stage and one for the second), the circuit court held that in *Noble v. Bruce*, 349 Md. 730 (1998), this Court affirmed the continuing vitality of the strict privity rule in legal malpractice cases and "closed the door altogether to non-client third-party beneficiary claims of legal malpractice in the estate planning context[.]" The court further held that even if *Noble* left open the possibility for such third-party beneficiary claims, the

8

undisputed facts showed that Pauline engaged Mr. Gentile to draft the 2019 Instrument to serve her own anticipated financial needs and her desire to cut Audrey out of her estate. The court explained that there was no evidence "that Pauline's direction [to Mr. Gentile] that Madelyn, her only other living child, receive 'anything left' was any more than incidental to removing Audrey as a beneficiary." Accordingly, the circuit court granted summary judgment in Mr. Gentile's favor on all claims.

## F

Madelyn noted an appeal to the Appellate Court of Maryland. While this case was pending before the Appellate Court, she petitioned for a writ of certiorari, which this Court granted. *Bennett v. Gentile*, 486 Md. 228 (2023). She presents three questions for our review, which we have rephrased as follows:

> Should the strict privity rule as applied in *Noble v. Bruce* be overturned in favor of the "balancing of factors" approach articulated in *Lucas v. Hamm*, 364 P.2d 685 (Cal. 1961)?
>
> If the strict privity rule under *Noble* remains binding precedent in the context of malpractice claims against attorneys who draft estate planning documents or give estate planning advice, does the third-party beneficiary exception to the strict privity rule apply to Madelyn's claims against Mr. Gentile?
>
> Can Madelyn recover litigation costs from Mr. Gentile under the collateral litigation doctrine?[6]

---

[6] Because we hold that the circuit court correctly granted Mr. Gentile summary judgment on Madelyn's claims, we do not reach this question, as the collateral litigation fees and costs were components of the compensatory damages she sought in her claims against Mr. Gentile.

II

A

Human interactions and activities involve risks and duties of many kinds. Risks and duties are allocated in two main ways. The first way is through contracts. Parties to a contract decide which duties they will assume and which risks they will bear. The second way is through tort law. For example, if you drive a car, you put others at risk, so tort law imposes a duty to exercise reasonable care when you drive. If you breach that duty and injure someone, you bear that loss by paying damages. Under tort law, therefore, you owe duties to people you do not know and have never met.

Although the attorney-client relationship is contractual by nature, the essence of a malpractice claim against an attorney sounds in negligence—the "negligent breach of the contractual duty."[7] *Flaherty v. Weinberg*, 303 Md. 116, 134 (1985). But even though the work of an attorney could harm non-clients, almost 150 years ago in *National Savings Bank of District of Columbia v. Ward*, 100 U.S. 195 (1879), the Supreme Court of the United States held that without fraud or collusion, privity of contract is required for alleging negligence against an attorney. In other words, under the strict privity requirement, in the absence of fraud or collusion, non-clients injured by an attorney's work have no recourse.

B

---

[7] The terms of the written agreement between the client and the attorney can be enforced in a breach of contract action. But given that the attorney-client relationship is a special relationship under our caselaw, the privity between the attorney and client also imposes, outside of the contract, a tort duty of care. *See, e.g.*, *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 625 (2017). That's why a legal malpractice claim can be alleged under both theories.

The strict privity rule has been applied in legal malpractice cases in Maryland since at least 1940. *Wlodarek v. Thrift*, 178 Md. 453 (1940). In *Wlodarek*, we held that a non-client could not hold a title attorney liable for a negligent title examination. *Id.* at 468. Three years later, in *Kendall v. Rogers*, 181 Md. 606 (1943), this Court applied the privity rule where a title attorney for the buyer negligently advised the non-clients about their duty to remedy a certain title defect to the transferred property. *Id.* at 613-14.

In *Flaherty v. Weinberg*, this Court considered abandoning the strict privity test in legal malpractice cases in favor of a "balancing of factors" test. *Id.* at 124. The balancing of factors approach was formulated by the Supreme Court of California in *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958), and later modified for application in the estate planning context in *Lucas v. Hamm*, 364 P.2d 685 (Cal. 1961). Under this test, courts consider the following factors to determine whether a non-client beneficiary of a will can sue the attorney who drafted the will: (1) the extent to which the transaction was intended to benefit the beneficiary; (2) the foreseeability of harm to the beneficiary; (3) the degree of certainty that the beneficiary was injured; (4) the causal connection between the injury and the attorney's negligent drafting; and (5) "the policy of preventing future harm." *Lucas*, 364 P.2d at 687.

In *Flaherty*, the home buyers sued the settlement attorney employed by the buyers' mortgage lender. 303 Md. at 132-33. At settlement, the attorney allegedly told the buyers that the property being conveyed was the one specified in the sale contract. *Id.* Recognizing that the strict privity rule barred the buyers' claims against the lender's attorney, this Court noted that other jurisdictions had adopted other approaches, including a "balancing of

11

factors theory." *Id.* Despite acceptance in other jurisdictions, this Court observed that this theory "has not met with universal acceptance" and has been criticized for being "too broad" and "so unworkable that it has led to *ad hoc* determinations and inconsistent results." *Id.* (internal quotations omitted). But although we did not replace the strict privity test with the balancing of factors test, we allowed the non-clients to pursue their claims under a third-party beneficiary theory. We will return to that below.

Thirteen years after *Flaherty*, the strict privity rule was invoked in the estate planning context in *Noble v. Bruce*, which consolidated two cases from the circuit courts for Somerset and Talbot counties. In the case from Somerset County—*Noble v. Bruce*—the testamentary beneficiaries sued the attorney who advised the testators on the structure of their estate plan, alleging that he negligently failed to recommend the use of credit or shelter bypass trusts to shelter up to $1.2 million from estate taxes. *Noble*, 349 Md. at 734. The result: more taxes paid by the estate; less money distributed to beneficiaries. *Id.*

In the case from Talbot County—*Fauntleroy v. Blizzard*—the testamentary beneficiaries sued the law firm that drafted a testator's will. *Noble*, 349 Md. at 737. The beneficiaries alleged that the firm negligently drafted the will contrary to the testator's intent, such that all taxes were paid out of the residuary estate—to which the plaintiff beneficiaries were entitled—instead of from the assets that generated the taxes, which were left to someone else. *Id.*

Taking up both cases together, the Court considered whether the strict privity rule should apply in the "will drafting or estate planning context" or should be replaced with the balancing of factors test that the Court had previously rejected in *Flaherty*. *Id.* at 741,

743-44. We observed that, despite a trend to depart from the strict privity rule, "a number of jurisdictions" still maintained it. *Id.* at 740. We noted that the strict privity rule in the estate planning context was justified on several public policy grounds. It protects the attorney's duty of loyalty and client confidences, prevents conflicts of interests between clients and beneficiaries, and enables the attorney to assess the risk of the engagement. *Id.* at 741-42, 758. And the strict privity rule "protects the integrity and solemnity of the will" as well as protecting an attorney from liability disproportionate to the legal fees earned.[8] *Id.* at 756.

We again declined to adopt California's balancing of factors test, but not without giving it full consideration. We discussed each factor and remained convinced that the balancing of factors approach was "too broad," unworkable, and susceptible to "ad hoc determinations and inconsistent results." *Id.* at 744. Thus, we saw "no valid reason to adopt" it. *Id.*

The Court also considered whether the *Noble* or *Fauntleroy* beneficiaries could pursue their claims as third-party beneficiaries, a topic we address below. But we will spoil the ending by adding that, at the end of the analysis, this Court rejected their third-party beneficiary theory, applied the strict privity rule, and affirmed the dismissals of both cases. *Id.* at 752-53.

---

[8] Madelyn argues that the public policy considerations justifying the strict privity rule do not apply to her. But we do not apply the rule on a case-by-case basis.

C

Madelyn urges this Court to overturn *Noble* and abolish the strict privity requirement for legal malpractice claims involving the negligent drafting of estate documents or negligent estate planning advice. She argues that beneficiaries should not be denied a remedy for injuries proximately caused by the negligence of the attorney who drafted the estate planning documents or rendered negligent advice to the attorney's now-deceased client. Madelyn also points to the modern trend of abandoning or relaxing the strict privity rule in this context. She notes that only a few states, other than Maryland, apply the strict privity rule in claims against the drafting attorney.[9] She contends that six states and the District of Columbia allow disappointed beneficiaries to sue estate planning attorneys in tort actions despite a lack of privity.[10] Six of those jurisdictions use the

---

[9] In addition to Maryland, eight other states apply the strict privity rule to such claims: Alabama, Colorado, Nebraska, New York, Ohio, Texas, Vermont, and Virginia. *See Robinson v. Benton*, 842 So.2d 631, 637 (Ala. 2002); *Baker v. Wood, Ris & Hames, Pro. Corp.*, 364 P.3d 872, 879 (Colo. 2016); *Lilyhorn v. Dier*, 335 N.W.2d 554, 555 (Neb. 1983); *Victor v. Goldman*, 344 N.Y.S.2d 672 (Sup. Ct. 1973), *aff'd*, 351 N.Y.S.2d 956 (App. Div. 1974); *Viscardi v. Lerner*, 510 N.Y.S.2d 183, 185 (App. Div. 1986); *Simon v. Zipperstein*, 512 N.E.2d 636, 638 (Ohio 1987); *Barcelo v. Elliot*, 923 S.W.2d 575, 578-79 (Tex. 1996); *Strong v. Fitzpatrick*, 169 A.3d 783, 786 (Vt. 2017); *Copenhaver v. Rogers*, 384 S.E.2d 593, 597 (Va. 1989). *But see Est. of Schneider v. Finmann*, 933 N.E.2d 718, 720-21 (N.Y. 2010) (allowing the personal representative of a decedent's estate to bring a legal malpractice claim against the drafting attorney); *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 787 (Tex. 2006) (same).

[10] According to Madelyn, those six states are Idaho, Missouri, Montana, West Virginia, Wisconsin, and Wyoming. *See Harrigfeld v. Hancock*, 90 P.3d 884, 888 (Idaho 2004); *Donahue v. Shughart, Thompson & Kilroy, P.C.*, 900 S.W.2d 624, 628-29 (Mo. 1995); *Stanley L. & Carolyn M. Watkins Tr. v. Lacosta*, 92 P.3d 620, 630 (Mont. 2004); *Calvert v. Scharf*, 619 S.E.2d 197, 203 (W. Va. 2005); *Auric v. Cont'l Cas. Co.*, 331

14

"balancing of factors" test articulated in *Biakanja v. Irving*, and one uses a pure negligence analysis.[11] Madelyn also points out that thirteen states allow such claims under a third-party beneficiary theory if the testamentary beneficiaries can establish that they were intended beneficiaries of the attorney-client relationship.[12] Another ten states permit both tort and third-party beneficiary contract claims,[13] and one state has legislatively abolished the strict

---

N.W.2d 325, 329 (Wis. 1983); *In re Est. of Drwenski*, 83 P.3d 457, 464-65 (Wyo. 2004); *see also Needham v. Hamilton*, 459 A.2d 1060, 1062-63 (D.C. 1983).

[11] That jurisdiction is West Virginia. *Calvert*, 619 S.E.2d at 694 ("Accordingly, we now hold that direct, intended, and specifically identifiable beneficiaries of a will have standing to sue the lawyer who prepared the will where it can be shown that the testator's intent, as expressed in the will, has been frustrated by negligence on the part of the lawyer so that the beneficiaries' interest(s) under the will is either lost or diminished.").

[12] Those states are Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Michigan, Minnesota, New Hampshire, Oklahoma, Pennsylvania, Rhode Island, and South Dakota. *See Espinosa v. Sparber, Shevin, Shapo, Rosen & Heilbronner*, 612 So. 2d 1378, 1379-80 (Fla. 1993); *Young v. Williams*, 645 S.E.2d 624, 625 (Ga. Ct. App. 2007); *Pelham v. Griesheimer*, 440 N.E.2d 96, 100 (Ill. 1982); *Walker v. Lawson*, 526 N.E.2d 968, 968 (Ind. 1988); *Goodman v. Goldberg & Simpson, P.S.C.*, 323 S.W.3d 740, 747-48 (Ky. Ct. App. 2009); *In re Succession of Killingsworth*, 292 So. 2d 536, 542-43 (La. 1973); *Mieras v. DeBona*, 550 N.W.2d 202, 211-12 (Mich. 1996); *Sec. Bank & Tr. Co. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 916 N.W.2d 491 (Minn. 2018) (acknowledging that a third party can bring a claim as an intended beneficiary in Minnesota, but finding that the petitioner was not an intended beneficiary of the trust); *Simpson v. Calivas*, 650 A.2d 318, 322 (N.H. 1994); *Hesser v. Cent. Nat'l Bank & Tr. Co.*, 956 P.2d 864, 867-68 (Okla. 1998); *Guy v. Liederbach*, 459 A.2d 744, 750 (Pa. 1983); *Credit Union Cent. Falls v. Groff*, 966 A.2d 1262, 1271-72 (R.I. 2009); *Friske v. Hogan*, 698 N.W.2d 526, 530 (S.D. 2005).

[13] The ten states are California, Connecticut, Delaware, Hawaii, Iowa, Kansas, New Mexico, Oregon, South Carolina, and Washington. *See Lucas*, 364 P.2d at 689; *Stowe v. Smith*, 441 A.2d 81, 84 (Conn. 1981); *Pinckney v. Tigani*, Del., No. 03A-12-001RRC, 2004, Cooch, J. (Nov. 30, 2004); *Blair v. Ing*, 21 P.3d 452, 464 (Haw. 2001); *Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987); *Pizel v. Zuspann*, 795 P.2d 42, 49, 53-54 (Kan. 1990); *Leyba v. Whitley*, 907 P.2d 172, 175-76 (N.M. 1995); *Hale v. Groce*, 744 P.2d 1289, 1292 (Or. 1987); *Fabian v. Lindsay*, 765 S.E.2d 132, 140 (S.C. 2014); *Bowman v. Doe*,

15

privity rule.[14] In sum, Madelyn argues that the strict privity rule as applied in *Noble* is unsound and therefore does not warrant the protective shield of stare decisis.[15]

Stare decisis is a Latin phrase meaning "to stand by things decided[.]" *Md. Small MS4 Coal. v. Md. Dep't of the Env't*, 479 Md. 1, 31 (2022). The essence of this doctrine is that we follow and apply our prior decisions even though, if we were starting from a clean slate, we would reach a different decision today. *State v. Waine*, 444 Md. 692, 700 (2015). Stare decisis promotes the consistent development of the law, reliance on our judicial decisions, "and the perceived integrity of the courts." *Lawrence v. State*, 475 Md. 384, 415 (2021) (quoting *State v. Stachowski*, 440 Md. 504, 520 (2014)).

As we recently explained:

> Although the doctrine is not absolute, *stare decisis* encourages courts to "reaffirm, follow, and apply . . . the published decisional holdings of our appellate courts[.]" Only in rare circumstances should this Court overrule its own precedent. We recognize two "extremely narrow" situations where it would be appropriate to do so. This Court may abandon the doctrine of *stare decisis* when the decision is "clearly wrong and contrary to established principles" or where there is "a showing that the precedent has been superseded by significant changes in the law or facts."

---

704 P.2d 140, 143 (Wash. 1985) (citing *Peters v. Simmons*, 552 P.2d 1053, 1055 (Wash. 1976)).

[14] Mississippi is the lone state that has legislatively abolished the privity requirement. *See* MISS. CODE ANN. § 11-7-20 (West 2024); *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359, 373-74 (Miss. 1992) (recognizing the legislative abrogation of the privity requirement and "extending liability to foreseeable third parties who detrimentally rely" on an attorney's services).

[15] Neither party has argued that *Noble* does not apply in the estate planning context where, as here, the estate is distributed under the terms of a trust instead of a will. Although we perceive no reason not to apply *Noble* in this context, this opinion should not be interpreted as holding that the laws governing wills and trusts are the same in any other respect.

*Wadsworth v. Sharma*, 479 Md. 606, 630 (2022) (internal citations omitted). And the argument that the majority in a prior case was wrong is not enough to disregard stare decisis. *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 69 (2010).

We also consider whether the question presents an issue of public policy suitable for the General Assembly to determine. *State v. Wiegmann*, 350 Md. 585, 604 (1998). Take contributory negligence, once referred to by an esteemed former member of this Court as that "dinosaur [that] roams yet the landscape of Maryland . . . feeding on the claims of persons injured by the negligence of another, but who contributed proximately in some way to the occasion of his or her injuries, however slight their culpability." *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 695 (2013) (Harrell, J., dissenting). In *Coleman*, the Majority upheld the doctrine, noting the General Assembly's repeated failure to abrogate that doctrine, and that Maryland stands with only four other jurisdictions in retaining contributory negligence as a defense. *Id.* at 691-95 (majority opinion). In any event, our predecessors kept the doctrine intact in the face of substantial arguments that it is antiquated and widely disfavored. *Id.* at 699 n.3 (Harrell, J., dissenting).

In asking us to disregard stare decisis, Madelyn does not argue that the decision was clearly wrong or contrary to established principles, and with good reason. The Court's analysis of the development of the strict privity rule was grounded in a thorough discussion and analysis of Maryland precedent going back decades.

Nor has Madelyn showed a significant change in law or facts to justify overturning *Noble*. When the Court in *Noble* kept the rule intact, it was aware of the arguments against the strict privity rule and the trend in other jurisdictions to move away from it. Madelyn

17

offers nothing new in this regard, except perhaps citations to a few non-Maryland cases decided after *Noble* that make the same case against the strict privity rule.

In any event, in the context of a trust instrument, changes in the law since *Noble* have, if anything, ameliorated the perceived harshness of the strict privity rule. On January 1, 2015, the Maryland Trust Act, codified at ET §§ 14.5-101 to -1006, went into effect. 2014 MD. LAWS, ch. 585. ET § 14.5-411 states:

> (a)(1) The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust.
> (2) To the extent practicable, the modification described in paragraph (1) of this subsection shall be made in accordance with the probable intention of the settlor.
>
> (b) The court may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the administration of the trust.
>
> (c) On termination of a trust under subsection (a) of this section, the trustee shall distribute the trust property in a manner consistent with the purposes of the trust as ordered by the court.

In addition, ET § 14.5-413 provides:

> The court may reform the terms of a trust, even if unambiguous, to conform the terms to the intention of the settlor if it is proved by clear and convincing evidence that both the intent of the settlor and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.

We do not know whether Madelyn sought to invoke the court's modification powers under sections 14.5-411 or 14.5-413 and, if she did not, we do not opine on whether a claim under either provision would have been appropriate or successful. We point this out only to show that the General Assembly, which is far better suited to determine questions of

18

public policy than this Court, took action that suggests an interest in these issues.[16] The General Assembly's activity in this space supports our decision to decline this opportunity to abrogate the strict privity rule.

D

1

Having determined that the strict privity rule survives Madelyn's challenge, we turn to the only exception recognized by this Court: the third-party beneficiary exception. We first recognized this exception in an attorney malpractice case in *Prescott v. Coppage*, 266 Md. 562 (1972). *Prescott* involved a claim by a creditor against the court-appointed receiver of the borrower and the receiver's court-appointed counsel. *Id.* at 565. The creditor alleged that the receiver and his attorney negligently caused the borrower to pay lower priority creditors rather than satisfying the creditor's higher priority claim. *Id.* Although this Court applied the privity rule to preclude a direct claim for negligence, we held that the creditor could maintain a claim as a third-party beneficiary. *Id.* at 574. We explained:

---

[16] The unusual posture in which this case comes to us also weighs against disturbing the strict privity rule. The underlying issue—whether the terms of the Trust required Wissahican to be conveyed to Madelyn or Audrey—was decided by the circuit court and affirmed by an en banc panel under Rule 2-551. Under section (h) of that rule, Madelyn had no further appellate rights. So whether the circuit court correctly decided that issue is not before us.

For purposes of our stare decisis analysis, having our hands tied in such a fashion denies us an appropriate basis to determine whether the injustice that Madelyn claims here was the product of the strict privity rule or of something else, including an erroneous circuit court decision. When a party urges a change in the law based on an alleged grave injustice caused by the existing law, we would be more likely to make the change if we are satisfied that the current law is the cause of the alleged injustice.

> [T]he intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention, are controlling factors in making the judgment whether there is or is not a class of persons meeting the definition of creditor beneficiary.

*Id.* This Court observed that the judicial order of appointment clarified that all creditors of the loan company were third-party beneficiaries of that appointment. *Id.* We added that the appointment of the attorney "by necessary implication bound him to those creditor beneficiaries." *Id.* Thus, we held that the third-party beneficiary theory was viable under those circumstances. *Id.*

2

We addressed the third-party beneficiary exception in *Flaherty v. Weinberg*—the case discussed above, in which the settlement attorney was sued by the non-client home buyers for a misrepresentation made at settlement. After rejecting California's balancing of factors test, this Court recognized a third-party beneficiary theory as the "sole exception" to the strict privity rule. *Flaherty*, 303 Md. at 130. We concluded that the buyers alleged sufficient facts to pursue their claim under a third-party beneficiary theory. *Id.* at 138-39.

This Court emphasized, though, that the exception has a "rather narrow scope" and applies only when the non-client alleges and proves that the client's intent and "direct purpose" in retaining estate planning counsel was to benefit the non-client. *Id.* at 130-31. The attorney would owe no duty to a non-client who derives merely an incidental benefit from the attorney's services. *See id.* at 131 n.6. Because the case came to us on a motion to dismiss, which tests the sufficiency of the allegations, we held that the borrower alleged

20

sufficient facts to support an inference that its lender intended for them to directly benefit from the attorney's services. *Id.* at 138-39.

3

This brings us back to *Noble*. In *Noble*, this Court not only applied the strict privity rule to the testamentary beneficiaries' claims, but also rejected their third-party beneficiary claims. Of importance to Madelyn's claims is whether *Noble* per se foreclosed all third-party beneficiary claims in the estate planning context or whether it left that door open, however so slightly, with each case rising or falling on the specific facts.

Reasonable minds might differ, as one could fairly find language in *Noble* to support either view. The circuit court interpreted *Noble* as closing the door on such claims, and not without reason. Among other statements, in *Noble*, the Court suggested that it was promulgating a bright-line rule: "We agree with the Supreme Court of Texas that 'the greater good is served by preserving a bright-line rule which denies a cause of action to all beneficiaries whom the attorney did not represent.'" 349 Md. at 759 (quoting *Barcelo v. Elliott*, 932 S.W.2d 575, 578 (Tex. 1996)).

Under *Noble*, one's status as a testamentary beneficiary does not entitle that person to claim third-party beneficiary status for claims against the drafting attorney. In fact, *Noble* presumes that a testamentary beneficiary is not a third-party beneficiary. But we do not read *Noble* as precluding third-party beneficiary status if, as framed in *Flaherty*, benefiting the non-client was the primary purpose of the client's engagement of estate planning counsel. *Flaherty*, 303 Md. at 130-31. That is because the Court in *Noble* did not categorically reject the beneficiaries' third-party beneficiary claims based on a bright-line

21

rule, but instead considered the merits of those claims, including the evidence in the record, and determined that the beneficiaries *were not* third-party beneficiaries. We explain.

In rejecting the third-party beneficiary claims in *Noble*, we first distinguished *Flaherty*. *Noble*, 349 Md. at 753. In *Flaherty*, the attorney communicated directly with the non-client claimants, and the claimants alleged they relied on the attorney. *Noble*, 349 Md. at 753-54. In contrast, in *Noble*, we stated that "[a]ttorney malpractice cases arising out of will drafting or estate planning generally are very different from the scenario presented in *Flaherty*" and implicate the public policy considerations in support of the strict privity rule. *Id*. at 753. The real-time interaction between a lawyer and non-client at a real estate settlement is unlike a will drafting lawyer's relationship—which may be nonexistent—to the beneficiary under a will. Thus, with respect to the third-party beneficiary exception, testamentary beneficiaries do not stand in shoes that are analogous to those of a non-client at a real estate settlement. We then addressed the beneficiaries' argument that "a testamentary beneficiary is by definition the intended beneficiary of the testator's contractual relationship with the attorney who drafted the will." *Id.* This was a per se argument which, if adopted, would have conferred third-party beneficiary status on all testamentary beneficiaries because of their status as such. We rejected that argument, emphasizing that "the client's intent to benefit the non-client must be a direct purpose of the transaction or relationship" to sustain third-party beneficiary status. *Id.* at 753-54. We explained:

> The testator/client's intent and purpose in executing a will may not be to benefit the beneficiaries named in the will, but rather to prevent the intestate distribution of assets. In other words, the testator's intent may be 1) to

22

exclude certain individuals who would otherwise inherit the testator's property without a will and to ensure that those individuals are unable to inherit, or 2) to personally provide for distribution of assets rather than leaving distribution to the intestate succession.

*Id.* at 754. Put simply, we recognized that people sign wills for all kinds of reasons, so the law will not presume that benefiting the testamentary beneficiary was the direct purpose of the attorney-client relationship.

We then turned to the facts underlying the beneficiaries' claims and concluded that "there is no admissible evidence contradicting the *supposition* that the testators intended their contractual relationships with their attorneys to benefit themselves in planning their estates and in creating and maintaining their wills."[17] *Id.* (emphasis added). The use of "supposition" in this context informs our understanding that the Court created a presumption against third-party beneficiary status in this context; that is, the "supposition" is that the testator executed the will to benefit herself, not the beneficiaries. And in the next sentence, we stated the consequence of failing to overcome the supposition with contrary evidence:

> *Thus*, we conclude that the beneficiaries in the instant cases are not third-party beneficiaries of the testators' representation agreements with the attorneys, and the third-party beneficiary exception to the strict privity rule does not apply.

*Id.* (emphasis added).

4

---

[17] This Court stated that, in attorney malpractice cases brought by non-clients in the estate planning context, "extrinsic evidence is not admissible to show that the testator's intent was different from that expressed in the will." *Noble*, 349 Md. at 755. Whether that rule applies in the trust context is not before us.

This Court's opinion in *Ferguson v. Cramer*, 349 Md. 760 (1998), issued the same day as *Noble*, offers more guidance on the viability of a third-party beneficiary claim in this context. There, we addressed "whether a beneficiary under a will may maintain a cause of action for professional malpractice against an attorney retained by the personal representative of the testator's estate." *Ferguson*, 349 Md. at 762. The sole heirs of the testator's estate sued the attorney employed by the estate's personal representative, alleging that the attorney negligently failed to properly administer the estate. *Id.* at 762-64. The beneficiaries contended that, although they did not employ the attorney, the third-party beneficiary exception nonetheless applied to their claim. *Id.* at 765.

> In the opinion's opening paragraph, we characterized our holding in *Noble*:
>
> We recently held that, as a matter of law, a non-client, testamentary beneficiary could not maintain a cause of action for professional malpractice against the testator's attorney for negligently drafting the testator's will or providing negligent estate planning advice where there was a lack of privity between the beneficiary and the attorney. We believe that the *Noble* decision is controlling and therefore affirm the judgment of the Court of Special Appeals.

*Ferguson*, 349 Md. at 762-63 (internal citation omitted). We also confirmed that this Court has "recognized the third-party beneficiary exception as a limited exception to the strict privity rule." *Id.* at 766. We explained that

> we held in *Noble* that the third-party beneficiary exception did not apply because the direct purpose and intent of the testator/client in executing a will was not *necessarily* to benefit the beneficiaries named in the will. Thus, under the traditional rule of strict privity, the beneficiaries could not maintain a malpractice action against the attorneys because no employment relationship existed between the beneficiaries and the attorneys.

*Id.* (internal citations omitted) (emphasis added).

Considered on their own, these statements *could* be interpreted as foreclosing all third-party beneficiary claims in this context. But we believe the more appropriate interpretation is that, as in *Noble*, we were explaining that a testamentary beneficiary is not automatically a third-party beneficiary. That is, by saying that the testator's intent "was not *necessarily* to benefit the beneficiaries named in the will[,]" we left open the possibility that a testator's primary intent *could* be to benefit the beneficiaries, a conclusion which accords with common sense.[18]

Indeed, if we were announcing a per se rule, the facts would not have mattered to the third-party beneficiary analysis. But just as we explained why the facts did not support a third-party beneficiary claim in *Noble*, we did the same in *Ferguson*. We observed that "the beneficiaries in the instant case did not allege in their complaint that [the personal representative] intended the beneficiaries to benefit directly from [the] services [of the] attorney." *Id.* at 770. Instead, we noted, "the beneficiaries alleged in the complaint that, 'as the only heirs of the [decedent's estate], [the beneficiaries] were specifically intended to be the beneficiaries of [the attorney's] service as attorney for the estate." *Id.* (second alteration in original). In other words, the beneficiaries in *Ferguson* relied exclusively on

---

[18]  Say, for example, a single parent with one child who has physical and mental disabilities and will need lifelong care and support, retains counsel for estate planning. During the consultation, the client explains to counsel that the sole purpose of the estate plan is to make sure that the child is taken care of after the client dies, and the engagement letter between the client and counsel identifies that purpose. We do not read *Noble* or *Ferguson* as precluding, as a matter of law, the possibility that the child could claim third-party beneficiary status.

their status as testamentary beneficiaries. We rejected that as insufficient for the same reason we did in *Noble*:

> The beneficiaries' status as the only heirs of [the decedent] does not automatically make them third-party beneficiaries of the contract between [the attorney] and [the personal representative]. As we noted in *Noble*, "[t]here is a critical difference between being the intended beneficiary of an estate and being the intended beneficiary of a contract between a lawyer and his client."

*Id.*

Accordingly, under *Noble* and *Ferguson*, a testamentary beneficiary is not automatically a third-party beneficiary of the attorney-client relationship. To claim third-party beneficiary status, the beneficiary will have to allege and then prove, as the Court said in *Flaherty*, "that the intent of the client to benefit the non-client was a direct purpose of the transaction or relationship." 303 Md. at 130-31.

5

We conclude that the circuit court was correct in granting summary judgment for Mr. Gentile on whether Madelyn was an intended third-party beneficiary of Pauline's and Mr. Gentile's attorney-client relationship. The material facts, which were not genuinely disputed, showed that Pauline's primary intent in revising the Trust in 2019 was to ensure that she had enough money to fund her care and to ensure that Audrey received none of the Trust property. That is not to say Pauline did not want Madelyn to reap a benefit if the sales proceeds she had anticipated from Wissahican's sale were not depleted by the time she died. But, as the circuit court observed, "Pauline's direction that Madelyn, her only other

26

living child, receive 'anything left' was [nothing] more than incidental to removing Audrey

as beneficiary." The circuit court did not err in granting summary judgment on that basis.[19]

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

---

[19] Madelyn argues that, in her capacity as Trustee, the strict privity rule is satisfied because she stepped into Pauline's shoes. We disagree. Madelyn stepped into Pauline's shoes solely as the Successor Trustee. Pauline's right to amend the terms of the Trust derived from her status as the Settlor, not Trustee. In other words, the Settlor, not the Trustee, retained Mr. Gentile to amend the Trust instrument.

In addition, because we affirmed the circuit court's entry of summary judgment against Madelyn on her claims against Mr. Gentile, we will not address her claim against him for attorneys' fees incurred in her litigation with Audrey.